Dayton v. Melick.

## CHARLES H. DAYTON

v.

## PETER W. MELICK and others.

Where a grantor, by misrepresentations, induces his grantee to believe that the property contains more land than in fact it does contain, such grantee is entitled to a proportionate deduction from the amount due on his mortgage given for part of the consideration, on its foreclosure.

Bill to foreclose. On final hearing on pleadings and proofs.

*Mr. A. A. Clark*, for complainant.

*Mr. John T. Bird*, for defendant P. W. Melick.

THE CHANCELLOR.

This suit is brought to foreclose a mortgage, dated December 17th, 1868, for $6,000, payable one-half April 1st, 1870, the rest April 1st, 1871, with interest running from April 1st, 1870, upon a farm and mill property in the county of Hunterdon. The mortgage was given by the defendant Peter W. Melick to the complainant, to secure part of the purchase-money of the conveyance by the latter to the

former, of the mortgaged premises, the deed for which bears date November 22d, 1868.

Melick, by his answer, alleges that, on the sale of the property to him, the complainant fraudulently misrepresented the superficial contents thereof as being ninety-seven and forty-two one-hundredths acres, while, in fact, there were only eighty-six and eighty one-hundredths acres, and that he falsely and fraudulently represented that the property included a tract of ten and sixty-two one-hundredths acres which did not belong to him and was not conveyed by the deed ; that he knowingly permitted Melick to base his calculations of the price to be paid to the complainant for the property, upon the false representations as to the contents. For this deceit, he claims a deduction from the amount of the principal of the mortgage of at least $1,380.60, being the amount of the alleged deficiency, at $130 per acre. He also alleges that the complainant refused to credit him with, or to allow to him the amount of, three payments made by him upon the mortgage, one of $400, made on or about February 5th, 1869 ; another of $675, made on or about April 1st, 1871, and the third, $50, made on or about April 1st, 1874, for which he claims credit and allowance.

This case was before the court on exceptions to the master's report, upon the exceptions to Melick's answer, and it was then held that the defence as to the deficiency in quantity of the land might be set up by answer, and that a cross-bill was not necessary for the purpose. *Dayton* v. *Melick, 12 C. E. Gr. 362.*

The evidence as to the representations which were made at the time of the sale of the property, is to be found in the testimony of the parties, Dayton and Melick, and that of Mr. Allen, the counsel of the latter, and Tunis D. Melick (Melick's son), and the deed and the map, which latter was exhibited by Dayton to Melick during the course of the negotiations.    That, in the negotiations for the sale, the farm was represented by Dayton to contain ninety-seven acres, or thereabouts, appears from the testimony of Dayton .

himself. He says that, during the negotiations, Melick asked him how much land there was, and that he said there were ninety-seven acres, or thereabouts, and he adds that the most of their negotiations were in regard to price. He admits, also, that he exhibited the map to Melick during the negotiations. It stated the number of acres as ninety-seven and forty-two one-hundredths, the contents stated in the deed from Dayton's grantor to him for the property. By his deed to Melick, Dayton represented that the contents were ninety-seven and nine one-hundredths acres. He had sold a small piece previously, as Melick knew, but Melick had no knowledge as to the contents, except from those representations. He proposed to have the land surveyed (evidently merely in order to ascertain its true contents accurately), and Dayton said that the map had been lately made for his grantor, Voorhees, and, no doubt, was correct; and said, also, that he presumed it had been made by Isaiah P. Large. Large was known as a careful, competent and accurate surveyor.

Melick's son swears that Dayton told his father that the map was correct, and that Large had made it; and he says that he (the witness) advised his father, in Dayton's presence, to have a survey made.

George A. Allen, Melick's counsel in the business, testifies that Dayton, in his presence, when the parties were at his office to complete the purchase and deliver the deed, stated that the property had been surveyed by Large. He says Dayton told Melick that Large had "run" (surveyed) the property.

Though Dayton, when he was first examined, expressly and explicitly denied that he stated to Melick that the map was made by Large, yet, when recalled as a witness (and he was re-examined without an order for the purpose, and notwithstanding objection on that account on the part of Melick) in his own behalf, he said that what he said at Mr. Allen's office on the subject, was, that he did not know who surveyed the property, and added that he might have said

that Large surveyed it, but he did not know who had done it.

It appears quite probable, from the testimony, that Melick would, before buying the property, have ascertained its contents by means of an actual survey, had not Dayton, by his statements or suggestions as to the accuracy of the map and its statements, dissuaded him from it. The clear weight of the evidence is that the price of the property was fixed by multiplying the alleged number of acres by the price of $130 an acre, the winter grain and a carpet in the house on the property being put in as equivalent to the difference between the contents, as stated by Dayton, and one hundred acres, which number (one hundred acres) was to be that for which payment was to be made at $130 an acre, the mill and its appurtenances being estimated at $4,000 in addition. Not only does Melick swear to this, but his son testifies to it, and there is other evidence, also. Dayton swears that the carpet and the grain were allowed, and a deduction (of $200, as he thinks) from the price made, to induce Melick to take the property, the latter being inclined to refuse to complete the purchase, and he says that Melick's refusal was not based on objection to the condition of the mill. Melick, on the other hand, swears that he refused to complete the purchase because of the bad condition of the mill, and that Dayton, to induce him to complete the purchase, offered to, and did allow him, $200, or thereabouts, merely in view of his objections to the condition of the mill.

Dayton, as before stated, expressly denies that he made, or agreed to make, an allowance with respect to the mill; but Mr. Allen testifies that, when they were in his office, Melick alleged that the mill was not so good as he had expected, was more out of repair than he had supposed, and Dayton said that was ridiculous, that Melick had seen the mill before he bargained, and that it was only a pretext, and Mr. Allen says Dayton gave Melick $167 " not to back out." He says Melick wanted $200, but did not get it, and, as he recollects it, $167 were agreed upon as the amount of

the abatement.  From this it appears that, on the subject
of the negotiations for the sale of the property, more reli-
ance is to be placed on Melick's testimony than on Dayton's,
for the former is corroborated, while the latter is contra-
dicted.

Vanderbeek, a surveyor, who surveyed the farm for Mel-
ick, in 1875, says its true contents are eighty-six and eighty
one-hundredths acres.  But McConaughy, a surveyor, called
on the part of Dayton, testifies that, according to Vander-
beek's map, there are ninety-three and six one-hundredths
or ninety-three and two one-hundredths acres.  He appears
to have had experience as a surveyor and civil engineer,
and to be competent to make an accurate calculation of the
contents of the plot.  No attempt was made by Melick to
sustain Vanderbeek's calculation, or to impeach that of
McConaughy.  The latter will, therefore, be accepted as
more accurate.  The difference between the contents, as
stated on the map shown by Dayton to Melick, and the
actual contents, will be taken to be four and forty one-
hundredths acres.  Dayton, by means of the misrepresenta-
tions of the contents of the farm, was enabled to obtain a
mortgage for $572 more than he otherwise would have
got, and than, in equity, he ought to have had.  He should
account for it in this suit.  *Couse* v. *Boyles*, *3 Gr. Ch. 212;*
*Weart* v. *Rose*, *1 C. E. Gr. 290.*

The allegation, in the answer, that, by the map which he
showed Melick during the negotiations, Dayton represented
that the property included a tract of ten and sixty-two one-
hundredths acres which he did not own and did not convey
to Melick, is, in this case, merely equivalent to a state-
ment that Dayton misrepresented the contents of the farm
to the extent of ten and sixty-two one-hundredths acres.
Although, by the map exhibited by Dayton, the lines of
the property necessarily include that tract, Melick, who
was well acquainted with the farm, knew that Dayton did
not claim to own it, and that it was not part of the prop-

Dayton v. Melick.

erty, and was not fenced in with it, but belonged to a Mr. Miller, who was in possession of it as owner.

Melick swears that he paid to Dayton, on account of the mortgage, $400, by his check, dated February 5th, 1869. It was not credited on the bond, and Dayton claims that it was not paid on that account, but was paid on account of the amount of a note for $779, which he swears Melick gave him, on the delivery of the deed, for so much of the purchase-money of the property. No one else swears to this note. Melick denies that he gave it, and Allen, while he does not swear positively, says his impression is very strong that Melick gave Dayton no note, made by himself, on the completion of the purchase, except a note for $500, which was given for part of the purchase-money. But Mr. Allen does not swear that any cash was paid by Melick to Dayton on that occasion, and there is no proof that any was paid, except the testimony of Melick himself, and that is too self-contradictory to be relied upon. In the outset, he swears he paid $4,000 in cash, and afterwards says it was from $300 to $500. Mr. Allen, in testifying to the items which made up the purchase-money ($17,000), says $551 were paid in some way, but he cannot say how. That sum, however, appears to be a balance which he finds is left after subtracting the items he can remember, from the $17,000. But among those items, is one of $225, which should be credited to Melick but once, and it is erroneously credited twice. So that the amount of the purchase-money which Mr. Allen cannot account for, is $776.

Melick says he gave but one note, and it was for $500. It was made payable on the 1st of April, 1869. The check for $400, in question, was given to Dayton, February 5th, 1869, before the note was due, and before any payment was due on the bond. Though his note and bond were outstanding, not yet due, he asked for no receipt, whether by endorsement on them or either of them, or otherwise, for the money then paid. He does not remember giving the check, or delivering it to Dayton; nor can he say whether

he gave it to Dayton personally, or sent it by mail. All he can remember about it is, that he got part of the money with which the check was paid, from John Smith. He says that the reason why he alleges this check was paid on the bond, is, simply, that he had nothing else to pay it to him for, to the best of his knowledge. And yet, at that time, Dayton held his note for $500, and there appear to have been other business transactions between them. When he went to the office of Dayton's attorney, shortly before this suit was brought, to make a settlement of the claim in suit, he saw the bond and the credit thereon, and says he recollected the payment of the $400, and saw that it was not credited on the bond, but yet said nothing about it, although he says he complained there that he had not had all the credits on the bond to which he was entitled. He says he cannot tell why he did not mention the $400. It is true the deed acknowledged the receipt of the consideration money of the conveyance; but it also is true that the defendant cannot tell, nor could Mr. Allen, how it was paid in full.

It is enough to say that the evidence that the $400 were paid on account of the bond, is not satisfactory. So, too, of the claim to a credit of $675 on the bond. Of that money, Dayton credited part ($246.65) on the bond. The rest, he says, was due him from Melick on another account, called the Apgar transaction. Melick says he paid Dayton what he was to pay him in that transaction, in cash. The latter says he did not pay in cash, but gave him his note. None of the other parties or witnesses, except, perhaps, Mr. Allen, throws any light on the subject. None of them can say that what Melick was to pay was paid in cash, or that he did not give his note for it. Mr. Allen says that the following entry was made by him in his docket on the occasion of the transaction:

"A. C. Apgar deed to J. C. Welsh one part of the land, and to P. W. Melick the other, and I took Melick's note for amount due Seals. Dayton assigned his claim to Melick, who, with Welsh, paid him his money."

Mr. Allen does not remember, however, that no note was, in fact, given, but says he is quite sure that if the payment had been made by note, he would not have stated in the entry that Welsh and Melick paid Dayton his money.

Neither Welsh nor Apgar remembers whether the payment, which was then made by Melick to Dayton, was in cash, or whether he gave his note for it. Dayton swears that it was not paid by Melick in money, but by his note, and that the note was given on the day of the settlement (meaning the occasion referred to by Mr. Allen); that it was for $430.35; that interest, for the time it was to run, was included in it, and, he thinks, it had three months to run. He further says, that the $675 check was sent to him by Melick in a letter; that when it was received he deducted the amount of the note from it, allowing two dollars for interest for the time the note still had to run, and sent the note to Melick, and gave him credit for the balance ($246.65) on the bond, under date of April 5th, 1871. Melick does not remember how the money ($246.65) credited on the bond under that date, was paid. The $50 payment, mentioned in the answer, was credited on the bond under date of March 29th, 1874.

Melick also claims allowance as a credit for a check made by him in favor of Dayton, for $185, dated August 26th, 1870. This claim, however, is not made in the answer. There is a credit on the bond of $182, under date of August 17th, 1870, and Dayton says that that is for the amount of the check, after deducting a bill of three dollars for dentistry work due him from Melick, and that the check was post-dated for Melick's convenience. It appears, indeed, to have been at first dated August 24th, 1870, one week from the 17th, and the date appears to have been altered to the 26th. Melick cannot tell how the $182, credited on the bond, were paid by him.

The evidence by no means convinces me that Melick should have credit on the bond for either of the sums of $400 and $675 claimed by the answer, and they will be dis-

allowed. Melick, as a man of business, was aware of the importance of receipts for money paid. His memory, in regard to the payments made by him to Dayton on account of the bond, is utterly unreliable. He can speak positively of none of them, except one of $100. He says he kept no account of his payments. Indeed, he transacted his business so loosely, according to his own statement, that it is impossible to reach a satisfactory conclusion in his favor in respect to any of the payments not credited on the bond, for which he claims allowance.

There will be a decree for the complainant in accordance with the views above expressed.