This is a suit to forclose a purchase-money mortgage on which it is admitted there is an unpaid balance of $1,206.50, with interest, from October 24th, 1922. The defendants set up, by way of counter-claim, their right to an abatement — first, of the sum of $1,000, representing the increased price of the lot purchased on the basis of its being a corner lot, which it was not, and second, of the cost of construction of cement sidewalks and curbs the full length of the lot on the street, which the lot was supposed to abut, but did not.
The original mortgage was in the sum of $2,000, was given to secure a part of the purchase price of the property therein described, and was subject to a first building and loan mortgage of $5,000. In May, 1922, the Philmar Construction Company was engaged in developing a tract of land in East Orange, New Jersey, and had divided the same into lots and plots and was erecting thereon a large number of houses. These houses were all constructed according to a common plan and were similar in appearance. In the latter part of May, 1922, the defendant was importuned by the company to purchase one of these lots and a house to be erected thereon, and a Mr. Herman, an officer of the company, took the defendants in his automobile to the tract and showed them a house in the course of erection. He offered to sell any lot in the tract, with a house erected thereon according to the plans and specifications, which were exhibited, for the sum of *Page 808 
$6,500. The defendants expressed a desire for a corner lot and were shown the lot which they eventually purchased, and were told that it was a corner lot, but that the price of that lot, by reason of its being a corner lot, with a house erected thereon, would be $1,000 more than the other lots, and that the company would sell them that lot with a house erected thereon for $7,500, accept a cash payment of $500, and take the balance of the purchase price in first and second mortgages of $5,000 and $2,000, respectively. The first mortgage was to be a building and loan mortgage to be arranged by the vendor. The defendants desired some changes in the specifications for the house to be built, and a written contract, providing for the sale of the lot and the building of the house, was entered into between the Philmar Construction Company and these defendants. This contract was dated May 31st, 1922, and the property was therein described as "the premises known and designated as the corner of Tremont avenue and Oak street, and being forty feet on Oak street and one hundred feet on Tremont avenue." At the date of the contract the tract of land which was being developed was characterized by some of the witnesses as a "dump," no streets being laid out and improved at that time. The line of Oak street and the line of Tremont avenue to the eastward of Oak street were apparent, because houses had already been constructed, or were in course of construction, on those streets. The line of Tremont avenue to the westward of Oak street, however, was not delineated, as no houses had been erected at that point. The land there was vacant and barren. It was quite apparent, however, that if Tremont avenue were extended to the westward of Oak street, the lot which the defendant purchased would be a corner lot. The changes in the specifications for the house desired by the defendants were finally agreed upon and reduced to writing and made a part of the contract. Philmar Construction Company proceeded with the construction of the house and the defendants took possession of it and moved into it in October of that year, before its final completion. The deed *Page 809 
for the lot purchased and the mortgage, which is the subject of this suit, were dated October 24th, 1922, but executed and delivered December 4th, 1922. The property is correctly described in the deed by metes and bounds without any mention of the lot as a corner lot. The $500 cash payment required by the contract was made by the defendant, $200 on the signing of the contract and $300 on the delivery of the deed. Some time during the following summer, when sidewalks and curbs were being constructed by the city on Oak street, the defendant noticed that this sidewalk and curb extended beyond the point where Tremont avenue, if extended, would intersect the westerly line of Oak street, and called Mr. Herman's attention to the matter and inquired of him as to whether Tremont avenue was not to be extended beyond Oak street. Mr. Herman referred the defendant to the city engineer, who was present, and the city engineer informed the defendant that the city ordinances did not then provide for the extension of Tremont avenue. Tremont avenue has never been extended, the sidewalks and curbs, which under the terms of the contract were to have been constructed along Tremont avenue at the side of the defendants' lot, have never been built, and the defendants' lot is not a corner lot. It is now admitted by all the parties that there is no present intention or immediate prospect of Tremont avenue being extended so as to make the defendants' lot a corner lot. There is a sharp conflict in the testimony of the defendants and that of the witnesses Herman and Goldfarb, who were officers of the Philmar Construction Company, and who executed the agreement of sale, with respect to the representations made at or about the time the contract was executed. All of the preliminary arrangements with respect to the sale were conducted by the witness Herman, and he testified that there was never any offer of the house and lot for $6,500, but that the original price was $7,300, afterwards reduced to $7,000, and that $500 was added to the purchase price on account of changes in the specifications of the house. The witness Goldfarb testified that none of the houses and *Page 810 
lots in that tract were sold for less than $6,900, and that at the time of this sale none of them had been sold for less than $7,000. He also testified that there was $500 added to the purchase price on account of the changes in the specifications for the house. Both the defendants, however, testified positively to the offer of other houses and lots for $6,500 and to the addition of $1,000 to that price for the house and lot purchased, because the lot was a corner lot, and also to the fact that no extra compensation was to be added for the changes in the specifications. Their story has the ring of truth, and I am constrained to accept their version as to what happened. In addition to this, it is quite apparent from the negotiations which resulted in the changes in the specifications that no additional compensation was to be asked for them, because it is admitted that the list of changes was reduced to writing by Mr. Thirkettle and handed to Mr. Herman to submit to Mr. Goldfarb; that some of the suggested changes were O.K.'d by Mr. Goldfarb and others refused. If additional compensation was to have been allowed for whatever changes were suggested by the purchaser, there is no apparent reason for Mr. Goldfarb's refusal to make all the changes suggested. It is admitted by both Herman and Goldfarb that at the time of these negotiations, and at the time the contract was executed, they knew that the lot purchased by the defendants was not a corner lot; that Tremont avenue had not been laid out by the city or dedicated, and that there was no present intention on the part of the city authorities to extend Tremont avenue beyond Oak street. The land which would have been included in Tremont avenue, if extended, was not a part of the Philmar tract and was not owned by that company. The defendants relied completely upon the representations of the officers of Philmar Construction Company as to the character of the lot purchased, as, from the condition of the land, it is obvious they were obliged to do. There is not the slightest doubt in my mind but that Mr. Herman, in negotiating a contract with the defendants and realizing that they preferred a corner lot, seized upon this fact as an opportunity *Page 811 
to boost the price of the house and lot, and exacted of the defendants a price $1,000 in excess of what he otherwise would have obtained, and this was done with a complete knowledge of the fact that the lot was not a corner lot; that there was no immediate prospect of its being made a corner lot, and that there would, consequently, be no sidewalks and curbs to construct on Tremont avenue. This conduct of Mr. Herman was approved and acquiesced in by Mr. Goldfarb, when he joined in the contract of sale, and, in my judgment, constituted a fraud on the defendants from which they are entitled to be relieved unless the objections advanced by the complainant against such relief are sound.
At the hearing the question arose as to the difference in the value of the lot purchased by the defendant and the value of the same lot if it had been a corner lot. At that time I was under the impression that the question was of some materiality to this issue, and by consent of counsel the opinion of an expert real estate appraiser was obtained on that question, and he has reported that there was no difference in the value of this lot as a corner lot or as an inside lot at the time of the purchase. This expert also says, however, that corner lots available for commercial or apartment-house sites have an increased value of twenty-five per cent. and upwards over inside lots. The witness Goldfarb testified that this lot, if it were a corner lot, and if Tremont avenue were laid out and improved, would have a value of $1,000 more than inside lots. But, upon reflection, it seems to me that the question as to the actual value of this lot as an inside or corner lot should have very little weight, in view of the fact, as I find it, that the Philmar Construction Company exacted $1,000 more for the lot on the basis of its being a corner lot than it would have required if it had been an inside lot. The right to relief is based, not so much upon the difference in the value of the lot as it is and as it was supposed to be, as upon the misrepresentation which was used as a lever to raise the price on the defendants.
Goldfarb's statement that the lot with the street built would be worth $1,000 more than inside lots rather confirms, *Page 812 
in my mind, the idea that the representation that the lot was worth $1,000 more because it was a corner lot, was made at the time of the negotiations.
It was estimated by the city engineer, who was sworn as a witness on behalf of the defendants, and whose experience and qualifications on this point are unquestioned, that the curbing and sidewalks along the line of the defendants' lot on Tremont avenue, if extended, would cost $451.74. The complainants claim, however, that the cost would have been very much less, if constructed by the Philmar Construction Company as a part of the general operation. Obviously, as the street was not cut through or laid out at the time this operation was going on, this sidewalk and curb could not have been constructed at that time. It is equally obvious that the city engineer is impartial and disinterested, and I am inclined to accept his estimate of the cost of such construction, based, as it is, upon his wide experience in such matters.
The complainant urges the following points against the defendants' plea for abatement and extinguishment of the mortgage, which is the subject of this foreclosure —
1. That there was no fraud in the inception of the mortgage, in that the defendants were not charged anything extra for the lot as a corner.
2. That defendants cannot maintain their counter-claim for sidewalks and curbing because the same is for unliquidated damages.
3. That the defendants cannot maintain their counter-claim on the ground that the lot is not a corner lot, because there is no provision in the executory contract of sale whereby the Philmar Construction Company was bound in the future to make the lot in question a corner lot, and that the executory contract merges in the deed.
4. That the defendants are estopped from setting up their claim in abatement by their laches and conduct in procuring extensions of time and making payments on account of the mortgage without objection.
I will consider these objections in their order. *Page 813 
 I.
This objection may be quickly disposed of, as I have already found as a fact that there was a fraudulent representation by the Philmar Construction Company that the lot sold to the defendants was a corner lot, and that $1,000 was added to the purchase price on the basis of its being a corner lot. This resulted in increasing the purchase-money mortgage, which is the subject of this foreclosure, by the amount of $1,000, and clearly, if not barred by the other points raised by complainants, defendants are now entitled to an abatement in the amount of the mortgage to the extent of this overcharge.
The principle that abatement may be allowed on foreclosure of a purchase-money mortgage on account of fraud is well settled.Shannon v. Marselis, 1 N.J. Eq. 413; O'Brien v. Hulfish,22 N.J. Eq. 472; Dayton v. Mellick, 32 N.J. Eq. 570; on appeal,34 N.J. Eq. 245; Kuhnen v. Parker, 56 N.J. Eq. 286; Redrow v.Sparks, 76 N.J. Eq. 133; Peterson v. Reid, 76 N.J. Eq. 377;
on appeal, 80 N.J. Eq. 450; Hawthorne v. Odenson, 94 N.J. Eq. 588.
In O'Brien v. Hulfish, supra, Chief-Justice Beasley said:
"I think there is no doubt that where a sale of real property is effected by deceit, and a mortgage given for the whole or a part of the purchase-money, relief in equity will be given to the party defrauded in a suit on the mortgage, whenever such course is necessary to reach a just result. Fraud, as a general rule, gives jurisdiction to a court of equity, and there can be no reason why, when the process of foreclosure is being used as a means of giving effect to a deception, such process should not be restrained and controlled as to prevent an injustice."
And further:
"If it be true, as he asserts, that he has been cheated into an agreement to pay more for the title to this property than it is worth, a court of conscience will not permit the excess over what is justly due to be exacted." *Page 814 
In Dayton v. Mellick, supra, Chancellor Runyon said:
"Dayton, by means of the misrepresentations of the contents of the farm, was enabled to obtain a mortgage for $572 more than he otherwise would have got, and than, in equity, he ought to have had. He should account for it in this suit."
In the same case, on appeal, Mr. Justice Parker said:
"If a vendor fraudulently represents the number of acres to be greater than the actual number conveyed, and thereby induces the vendee to give more for the tract than he otherwise would, the vendee is entitled to an abatement."
This same principle applies to any misrepresentation which results in the payment of a higher purchase price than otherwise would be paid. The first point argued, therefore, cannot prevail.
 II.
Counsel for complainant cites Corson v. Bailey, 3 N.J. Adv.R. 926, and Mirkin v. Bowker, 133 Atl. Rep. 41, in support of this point. Neither of these cases, however, has any application to the case sub judice. In both of these cases the counter-claim sought to be asserted arose out of transactions wholly independent and having no relation whatever to the origin of the mortgage therein sought to be foreclosed, and were matters of strict set-off. Counsel for complainant has evidently failed to distinguish between a counter-claim based upon strict set-off and one based upon the right of recoupment. Set-off is a purely statutory right and is strictly limited by the statute to liquidated damages. 4 Comp. Stat. p. 4836; 1 Comp. Stat. p. 433;Roseville Trust Co. v. Barney, 88 N.J. Law 146; reversed,89 N.J. Law 550, but this principle approved. Norton v.Sinkhorn, 63 N.J. Eq. 313. On the other hand, recoupment is a common law right (24 R.C.L. 793), and applies to unliquidated as well as liquidated damages. Norton v. Sinkhorn, supra.
Counter-claim may include either set-off or recoupment or both. In the Sinkhorn Case Chief-Justice Depue said:
"But the defendant's claim, as set out in the answer, is not a counter-claim for liquidated damages, such as would *Page 815 
constitute it a set-off. The claim set out in the answer is for unliquidated damages arising from the failure of the complainant to perform his contract according to its terms. The distinction between a set-off and recoupment is well settled. Recoupment, at common law, was a claim in reduction of the amount due to the party. * * *
"The doctrine of recoupment had been adopted in courts of equity long before it was introduced by statute into the practice of courts of law. * * *
"The principle that lies at the foundation of this doctrine is that the amount which the plaintiff is entitled to recover shall be abated or reduced by reason of his own failure to perform obligations which, by the same contract, devolved upon him, whereby the defendant has sustained damages.
"In substance and effect it may be likened to the reduction of the amount recoverable upon a contract because of a failure of consideration."
The application of this language to the present issue is obvious. It was a part of the mortgagee's contract to construct sidewalks and curbs. This part of the contract has never been performed. The cost of such construction was included in the purchase price of the property, and it may be assumed was covered by the mortgage, and an abatement of the amount it would have cost to construct that sidewalk and curb should be allowed. As stated above, the estimate of the cost of those sidewalks and curbs was $451.74. The mere fact that the damages sought to be set up as an abatement of the mortgage debt in a suit to foreclose the mortgage are unliquidated does not prevent equity from granting the abatement. Coster v. Monroe ManufacturingCo., 2 N.J. Eq. 467; Couse v. Boyles, 4 N.J. Eq. 213; O'Brien
v. Hulfish, supra; Kuhnen v. Parker, supra; Peterson v.Reid, supra.
In Peterson v. Reid, supra, the mortgagees had conveyed to the mortgagor certain lowlands of small value and covenanted to fill in the same, and the purchaser gave a mortgage for the price based upon the value of the land filled in. Upon *Page 816 
proceedings brought to foreclose the purchase-money mortgage, the defendant sought an abatement from the mortgage debt for the damages sustained by reason of the mortgagee's failure to carry out this covenant. Vice-Chancellor Stevenson said (at p. 383):
"If a man conveys a parcel of unimproved land and at the same time covenants to erect a valuable building upon it, and takes back a purchase-money mortgage based on the valuation of the land with the building on it, and then completely defaults in his covenant to erect the building, is it possible that under any system of jurisprudence in a civilized state he would be permitted to foreclose his purchase-money mortgage for the entire amount, while the unfortunate mortgagor would be left to an action at law for his damages which he might never be able to collect?"
This case was reversed in the court of errors and appeals (80 N.J. Eq. 450) on the ground that the defendant, who was an assignee of the original mortgagor, had no standing to ask for an abatement because he bought the premises subject to the mortgage. The latest case affirming the principle referred to by Vice-Chancellor Stevenson in the Peterson Case is that ofHolloway v. Hendrick, 98 N.J. Eq. 713, in which the court of errors and appeals affirmed the decision of the court of chancery in the opinion of Vice-Chancellor Fielder, in which he said:
"Finally, the defendants claim that the house which Mountain Lakes, Incorporated, agreed to construct upon the land in question does not conform to the house for which the defendants and Frank Hendrick contracted, and, therefore, the defendants owe nothing on the mortgage. This claim is stated in a nebulous fashion and the evidence does not support it. Had it been established that the house was not constructed according to the contract, and had this been a purchase-money mortgage, the defendants might be entitled to a set-off or to an abatement as against the mortgage debt, but this was not a purchase-money mortgage."
But in the instant case the mortgage, which is the subject of the foreclosure, is a purchase-money mortgage. *Page 817 
 III.
Complainant cites Davis v. Clark, 47 N.J. Law 338, andLong v. Hartwell, 34 N.J. Law 116, in support of this point. Neither of these cases is authority for the propositions for which cited.
In Long v. Hartwell, Mr. Justice Van Syckle said:
"The rule to be deduced from the authorities is, that the executed contract supersedes all prior negotiations and agreements, where the last contract covers the whole subject embraced in the prior one. But where the stipulation is to do a series of acts at successive periods, or distinct and separable acts to be performed simultaneously, the executory contract becomes extinct only as to such of its parts as are covered by the conveyances."
But the deed which was delivered to the defendants in the instant case was not in performance of the agreement to either convey a corner lot or to build sidewalks and curbs. It is true that the deed conveyed the lot which was purchased, describing it by metes and bounds, but not as a corner; but it, nevertheless, did not convey a corner lot, which is what the vendor agreed to convey. It was, at best, a performance of such part of the contract as it purported to execute, namely, a conveyance of a particular piece of land. As well say that by the delivery of the deed for the lot the agreement to build the house was also executed. The delivery and acceptance of the deed, in pursuance of an executory contract, is, perhaps, prima facie evidence that it expresses the final intention of the parties, but only so far as it purports to carry into effect the executory contract. The cutting through of a street and building of sidewalks and curbs was executory even after the delivery of the deed. That part of the contract remained, and still remains, unfulfilled. There was no more a merger of these covenants in the contract by the delivery of the deed than there was a merger of the agreement to fill in the lowland upon the delivery of the deed in the case of Peterson v. Reid, supra, or than there would have *Page 818 
been a merger by the delivery of a deed in the recent case ofHolloway v. Hendrick of an agreement to build a house according to certain plans and specifications. In Roberts v.James, 85 Atl. Rep. 244, Mr. Justice Swayze, speaking for the court of errors and appeals, held that a representation by the vendors that they intended to build a railway station and cement walks upon vacant lots entitled the vendees to avoid the contract where it appeared that the representations were false. The third point advanced by the complainant against defendants' claim for abatement is untenable.
 IV.
There is nothing in the testimony which indicates any laches, estoppel or waiver on the part of the defendants. The facts urged in support of this contention are that, after the defendant discovered that his lot was not a corner lot, he continued making installment payments on the mortgage and delayed his claim to an abatement to the point of waiver, and that he is thereby estopped from now asserting the claim for abatement. It is true that the defendant learned in 1923 that his lot was not a corner lot, but it appears that he was subsequently assured by Mr. Herman or Mr. Goldfarb, or both, that Tremont avenue would be cut through and his lot made a corner lot. It is also apparent that defendant continued his complaints to both these witnesses right up to within a short time before the filing of the bill, and that he was repeatedly assured by one or both that he would receive what he bought. His continuing to pay installments due on the mortgage under these circumstances does not bar him from now asserting this claim. It is not suggested that the complainant has been placed in any worse position because of these payments by defendant, and the evidence demonstrates that it has not. The position of the defendants, however, has been considerably changed by reason of the wrongdoing of the Philmar Construction Company, because, relying upon the representations that the lot was a corner lot, they proceeded to, and did, make valuable improvements on *Page 819 
the property, and this has changed their position so that they are not now obliged to rescind their contract.
The present suit is instituted by the assignee of the Philmar Construction Company. The Philmar Construction Company now being out of existence, the complainant has taken over, at least, to a large extent, the assets of the mortgagee, Mr. Goldfarb, who was the person most interested in the Philmar Construction Company, is also an officer and stockholder in the complainant company. He had full knowledge of the whole transaction of which this mortgage was a part, and that knowledge will be imputed to the complainant-assignee.
For the reasons herein expressed, I will advise a decree in favor of the defendants, and as it appears that the amount of the abatement to which the defendants are entitled is, at least, equal to the amount due on the mortgage, the decree will provide that that mortgage be surrendered for cancellation, and that the excess of the abatement allowed, if any, be paid to the defendants by the complainant, with costs.