13 N.J. Super. 577 (1951)
81 A.2d 33
JAMES D. WINANS, PLAINTIFF,
v.
ASBURY PARK NATIONAL BANK AND TRUST COMPANY, & C., ET AL., DEFENDANTS. ASBURY PARK NATIONAL BANK AND TRUST COMPANY, AS EXECUTOR, & C., PLAINTIFF,
v.
JOSEPHINE V. WINANS, INDIVIDUALLY AND AS EXECUTRIX, & C., ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 27, 1951.
*579 Mr. Alan V. Lowenstein for James D. Winans (Messrs. Riker, Emery & Danzig, attorneys).
Mr. Conover English for Asbury Park National Bank & Trust Company (Messrs. McCarter, English & Studer, attorneys).
Mr. Milton M. Unger for Josephine V. Winans, individually (Messrs. Milton M. and Adrian M. Unger, attorneys).
Mr. John Winans for Josephine V. Winans, executrix.
Mr. James L.R. Lafferty for Elizabeth C. Winans, guardian ad litem of Derek Torrey Winans and Peter Torrey Winans (Messrs. Lindabury, Steelman & Lafferty, attorneys).
*580 Mr. Charles S. Smith for Fannie W. Winans and the Rector, Wardens and Vestrymen of Trinity Church.
FREUND, J.S.C.
These two consolidated actions involve 1,552 shares of the common capital stock of C.G. Winans Company, owned by the estate of Wiliam Winans, deceased. The first suit by James D. Winans was brought to enforce the sale of the stock to him pursuant to the terms of an agreement with his uncle, the decedent, dated December 20, 1934, referred to as the 1934 agreement, or in the alternative under an agreement between them dated April 27, 1943, referred to as the 1943 agreement. The second suit by the Asbury Park National Bank & Trust Company, one of the executors under the last will and testament of William Winans, seeks instructions regarding the disposition of the stock held in the estate.
C.G. Winans Company was incorporated under the laws of New Jersey in 1905, being the successor to a partnership known as Coulter and Winans, which had been engaged in business since the 1890's. Carlton G. Winans, father of the plaintiff, James D. Winans, and older brother of William Winans, had been a member of the firm, and he and William were original stockholders, directors and officers of the corporation. Upon the death of Carlton G. Winans in 1925, William became the active head of the corporation and continued as such until his death on February 3, 1949. The plaintiff, James D. Winans, inherited some stock from his father, was elected a director of the corporation in 1926, and became actively associated with the company in 1930. William Winans was a bachelor, and a relationship of mutual trust and confidence existed between him and his nephew, James. From 1934 until 1943, several agreements were entered into between them, the purport of which was that James vested in his uncle, William, full voting rights on his shares, and William granted James the right to acquire his shares of stock after his death. Evidently, William planned that James should succeed him in the management and control of the corporation.
*581 The last agreement was executed on April 27, 1943. It was clearly the intention of the parties that it should supersede the original agreement of December 20, 1934. Both James D. Winans and the defendants in his suit claim that the 1943 agreement is ineffective, but for different reasons. James D. Winans claims that it is invalid being in contravention of R.S. 14:10-10, in that it granted to William Winans a voting trust with respect to James' stock for a period beyond the statutory maximum of ten years, and that by reason thereof the 1934 agreement is revived. The defendants, however, urge that the 1943 agreement is valid, but that the plaintiff has forfeited his rights thereunder because of his default in performance.
The plaintiff, James D. Winans, can rely only upon the 1943 agreement, which superseded all prior contracts. Implementing it, William Winans on April 30, 1947, executed his last will and testament, and incorporated it by reference. The 1934 agreement, in so far as the stock of William was concerned, gave James an option to buy upon William's death. The price was to be the actual value, including good will, to be agreed upon or determined by the president of a Newark banking institution. The 1943 agreement effected two changes in the 1934 agreement, viz.: there was to be a sale of the stock by the estate to James rather than an option in James to buy, and the price was to be the book value, without allowance for good will. Thus, the parties to the agreements were the same, and the subject matter was the same. The terms being inconsistent, the prior agreement was superseded by the latter. The general rule is that an executed contract which covers the whole subject matter embraced in a prior one between the same parties rescinds the prior agreement. Long v. Hartwell, 34 N.J.L. 116 (Sup. Ct. 1870); Curtiss-Warner Corp. v. Thirkettle, 99 N.J. Eq. 806 (Ch. 1926), affirmed 101 N.J. Eq. 279 (E. & A. 1927); Montclair Distributing Co. v. Arnold Bakers, Inc., 1 N.J. Super. 568 (Ch. Div. 1948).
In the 1943 contract James granted to his uncle, William, *582 for life the right to vote his shares of stock. It provided as follows:
"11. Voting Rights. From and after the execution and delivery of this contract and during and throughout the lifetime of `vendor' (William), the `vendor' shall have, exercise and enjoy full `voting rights' under and in relation to the `vendee's' (James') stock; * * *"
"* * * and `vendee' hereby agreed that he will not grant, convey, transfer or pledge all or any part of the `vendee's stock' at any time during the life time of the `vendor' in such manner as to defeat or impair the `voting rights' hereby granted to `vendor.'" (Paragraph 9.)
The plaintiff argues that the foregoing provision is invalid, not only because R.S. 14:10-10 prohibits vesting of voting rights for a period exceeding ten years, but also because the agreement did not provide for the transfer of the stock to a voting trustee, but merely for the bare transfer of voting rights. The pertinent provisions of the statute read as follows:
"14:10-10. Voting trust
One or more of the stockholders of any corporation organized under this title may, by agreement in writing, deposit capital stock with or transfer capital stock to any person or corporation authorized to act as trustee, for the purpose of vesting in such person or corporation the right to vote thereon, or for such other lawful purposes as may be agreed, for any period of time determined by the agreement, not exceeding ten years, upon terms and conditions stated in such agreement, pursuant to which such person or corporation shall act.
After filing an unexecuted copy of the agreement in the principal office of the corporation in this state, which copy shall be open to the inspection of any stockholder of the corporation or any depositor under the agreement, daily during business hours, the certificates of stock so transferred shall be surrendered and canceled, and new certificates therefor shall be issued to such transferee, who may be designated voting trustee, in which such new certificates it shall appear that they are issued pursuant to such agreement, and in the entry of such transferee as owner of such stock in the proper books of the issuing corporation that fact shall also be noted. Thereupon said transferee may vote upon the stock so transferred during the period specified in the agreement."
William Winans died on February 3, 1949, so that actually the voting trust agreement was operative for only six years. *583 Hence, under the facts of this case, it is not necessary to decide whether a grant of voting rights for life is invalid by reason of R.S. 14:10-10. Here, the question is moot. The trustee lived less than ten years and any taint of invalidity in the agreement because its duration was for life rather than the statutory maximum period has been absolved by his death. So, too, with respect to the failure to transfer the stock into the name of the voting trustee.
The portion of the contract dealing with the voting rights to James' stock is separable from that part which relates to the agreement for the sale of William's stock to James. James carried out his part of the agreement in so far as it related to his stock, that is, he vested the voting rights in his uncle William for life and he did not transfer or pledge his stock during that time. Therefore, even if his agreement contravened R.S. 14:10-10, he had performed. Neither did he repudiate the agreement. By this proceeding, he is seeking specific performance of the stock sale provisions of the 1934 agreement, or in the alternative the 1943 agreement.
Assuming, arguendo, the invalidity of the voting trust agreement, it would not, under the circumstances of this case, render separable portions of the contract void and unenforceable. The general rule is: "A bargain that is illegal only because of a promise or a provision for a condition, disregard of which will not defeat the primary purpose of the bargain, can be enforced with the omission of the illegal portion by a party to the bargain who is not guilty of serious moral turpitude unless this result is prohibited by statute. Recovery is more readily allowed where there has been part performance of the legal portion of the bargain." Restatement, Contracts, sec. 603, p. 1119; Fishell v. Gray, 60 N.J.L. 5 (Sup. Ct. 1897). Cameron v. Intl. Alliance, &c., U.S. & Canada, 119 N.J. Eq. 577, 590 (E. & A. 1935). "It may sometimes happen that a bargain is illegal when it is made either because of the illegal purpose of the parties to it or for other reasons, and that when the bargain is performed the transaction has become lawful either because the purpose of *584 the parties has changed or because changes in the law or other external circumstances have made that lawful which was previously unlawful." Williston, Contracts (Rev. ed.), vol. VI, sec. 1758, p. 4992.
The 1943 agreement being valid, has the plaintiff defaulted in performance? Under Paragraph 6 of the contract, the plaintiff agreed to pay the purchase price of the stock in ten equal annual instalments, the first to be paid to the decedent's estate "not later than six (6) months after the time of the probate of the last will and testament of the `vendor' (decedent) and issuance of letters testamentary thereon." The Seventh Paragraph of the agreement provided, "the personal representatives of `vendor' may at any time by an instrument in writing signed by them unanimously extend the time of any payment or payments of principal, interest or both to become due hereunder, upon such terms and conditions as they may see fit to impose, or unconditionally." The decedent's will was probated February 21, 1949, and letters testamentary thereon were issued on or about February 23, 1949. The will by reference incorporated the 1943 contract and charged the executors with observance of its terms. The plaintiff was, therefore, obligated to pay one-tenth of the purchase price not later than August 23, 1949, unless the time for such payment had been extended unanimously in writing signed by the decedent's executors. Admittedly, the plaintiff did not make such payment before August 23, 1949, nor was an extension of the time for such payment requested by the plaintiff or granted by the executors. Following William's death, the plaintiff, as a result of consultation with his tax advisors and attorneys, decided that performance in accordance with the terms of the agreement would be burden-some and disadvantageous to him because of tax liabilities. Therefore, he submitted to the executors divers proposals for consummation of the sale. In order to save taxes, he suggested conversion of the stock held by the estate into preferred stock. However, these proposals were unacceptable, the plaintiff did not perform within the time required by the *585 contract, and the executors did not extend the time for performance. Indeed, the plaintiff does not seriously contend that he did not default. Accordingly, he is not entitled to relief under his complaint, and it will be dismissed.
We come now to the complaint of the executor, the Asbury Park National Bank and Trust Company, seeking instructions regarding the sale of the shares of stock. The executor has received offers for the purchase of the stock from Ridgewood-Winans Company and Josephine V. Winans, each for one-half of the stock at a price of $121,940.64, conditioned upon acceptance of the other's offer. Together the offers amount to $243,881.28, which is the book value, the price at which James D. Winans had the right to buy the stock under the contract. By his complaint, Winans represented himself as ready, willing and able to perform under the 1943 agreement, and at the trial tendered to the executors a sum equal to the principle and interest then owing under the contract.
It is my opinion that a public sale of the stock should be held by the executors and the stock sold at the highest price and upon the best terms obtainable, with the first right to James D. Winans to buy at such price and terms. My reason for granting him this privilege is to carry out the manifest intention of the testator. From the history of the corporation, the interest of the Winans family therein, the relationship between the decedent and his nephew, the various agreements and the will, it is abundantly clear that it was the desire and intention of the decedent that his nephew should succeed to his interest in the corporation. Paragraph "Sixth" of the will expressly stipulates: "* * * No sale or other disposition of any capital stock shall be made in derogation of any rights of James Dusenberry Winans as mentioned and recognized by Paragraph `Seventh' of this will," which refers to the contract of April 27, 1943, and provides as follows: "* * * Now, therefore, I hereby make all and singular the provisions of said contract and power of attorney a testamentary disposition hereunder and hereby authorize and direct by executors and trustees and their *586 several successors in office in all respects to perform and carry out all and singular the provisions aforesaid with the same force and effect as it (if) the same were incorporated at length herein, * * *."
Although James D. Winans has by reason of default forfeited his right to acquire the stock under the contract, I have not the slightest doubt but that the intention of the testator will be effectuated if he is given the right to purchase the stock in preference to any other bidder at the price and upon the terms of the highest bid. To allow another to acquire the stock without according Winans the opportunity to meet the bid would be to disregard the clear intention of the decedent. When the intention of a testator is as patent as here, it is the duty of the court to make its achievement possible.
Judgment accordingly.