52 N.J. Super. 563 (1958)
146 A.2d 495
ARTHUR JONES, PLAINTIFF-RESPONDENT,
v.
LEE GABRIELAN, ADELE GABRIELAN AND JONES TRUCKING COMPANY, A NEW JERSEY CORPORATION, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1958.
Decided November 25, 1958.
*567 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Ira D. Dorian argued the cause for defendants-appellants.
Mr. Harry Schaffer argued the cause for plaintiff-respondent.
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff, Arthur Jones, brought this action to obtain specific performance of and other relief appertaining to a 1952 contract of sale in which he conveyed *568 the assets and facilities of the Jones Trucking Company to the defendants, Lee and Adele Gabrielan. The judgment of the Superior Court, Chancery Division, enforced, in effect, the provisions for default contained in that contract, required the defendants to surrender control to Jones of all the assets, facilities and management of the corporation, and ordered the defendants to account for moneys wrongfully withdrawn from it. The Chancery Division also dismissed the counterclaims brought by the Gabrielans and the corporation as unsupported by the evidence. The defendants appeal.
The Jones Trucking Company, a New Jersey corporation (hereinafter mentioned as the company), was organized and started business on May 1, 1951. On July 29, 1951 plaintiff, as the majority stockholder, entered into an agreement with Lee Gabrielan and Adele, his wife (hereinafter mentioned as Lee and Adele), for the sale by Jones of all the common stock of the corporation for $165,000, to be paid by a $25,000 deposit and $140,000 in weekly installments. The schedule annexed to the contract listed the specific assets that were included in the sale. The other excluded assets, having a book value of $154,788.79, remained with the plaintiff, who assumed and paid corporate liabilities of $136,527.91. The excess of book value of assets transferred over liabilities assumed was $18,260.08. This amount represented a corporate distribution to Jones. Although it has been carried on the company's books as an asset (debt owing from Jones), it should have been written off against surplus at the end of 1951.
On the same day, July 18, 1951, Jones and the Gabrielans entered into another agreement respecting the $25,000 deposit. They agreed that Lee was to make out a check for this amount and deposit it with an escrow agent, to be held until $25,000 was paid to Jones by installments and then to be returned to Lee and destroyed. Jones never received the proceeds of this check. Hence it appears that the Gabrielans have not invested any of their own funds in either the contract of sale or the company.
*569 Pursuant to the contract, defendants made weekly payments totaling $9,533.38 in principal and interest. They defaulted in February 1952. Thereupon Jones brought suit for the unpaid balance of the purchase price. Defendants' answer admitted the making of the agreement but denied that a default had occurred.
Subsequently, a settlement was negotiated, and a stipulation of dismissal, consented to by the respective parties, was filed with the court. The settlement resulted in the execution and delivery of a new contract, dated September 24, 1952.
This second agreement, the basis of the present suit, was made by the plaintiff, as seller and sole owner of the Jones Trucking Company, and Lee Gabrielan. Adele was neither a party nor a signatory thereto. The agreement provided that there would be issued 1,000 shares of stock and, for the purposes of the contract, each share would have a value of $165. The value of the company was agreed to be $165,000. The seller was to retain ownership of the stock, except that those shares which represented payments on account of the purchase price were to be held in escrow by the buyer's attorney. The contract further provided that, if there was a default, plaintiff had the right to repurchase the stock held by the escrowee at a price to be agreed upon or as might be fixed by arbitration. Lee had the right to conduct the company's business, but not to undertake any major policy, operational or management changes without the written consent of the seller. If Jones withheld his consent, the matter would then be submitted to arbitration.
The provisions governing the consideration of $165,000 recited that $8,800 was deemed to have been paid already and that, as a result, Jones would transfer 53 shares to the escrowee. The balance of $156,200 would be secured by an interest-bearing promissory note executed by Lee and Adele and payable in weekly installments. It was specifically provided that such installments "may be advanced out of corporate profits and/or earnings, if existent." As each payment of $165 was received by Jones, he would assign *570 and deliver to the escrowee one share. In addition, the corporation was to execute a $50,000 first mortgage on its realty and a $106,200 chattel mortgage, both in favor of the seller.
Upon a default, in addition to permitting Jones to repurchase the stock held by the escrowee, the buyer agreed to turn over to the seller all the assets, management and control of the company. The buyer gave the seller's attorney an irrevocable power of attorney to consent to any judgment necessary to accomplish that result in the event of a failure to comply.
The buyer had the right to draw up to a stipulated sum each week ($125 per week during the first year; $150 thereafter), but the buyer was not to charge off to the business any personal, household or any other expense not connected with the business. The buyer was to supply the seller with monthly and annual reports reflecting the complete financial status and condition of the company. When the agreement was made, the buyer owed accrued interest of $2,349, of which he could pay but $180. Notes executed by the buyer and secured by 53 shares of the company covered the balance. Although not a party to the agreement, Adele was a co-maker with Lee on the note dated September 24, 1952 for $156,200.
On February 29, 1956 Jones filed a complaint against Lee and Adele on the grounds that they had breached the contract of 1952. It charged that $54,475 was due under the agreement but only $50,000 had been paid, leaving an arrearage of $4,475 plus interest thereon, the equivalent of 14 weekly payments; that Lee had failed to surrender the assets and management of the company to plaintiff as required; that Lee had refused to furnish the financial reports; that the payments which were made under the contract were not only out of corporate profits or earnings but out of capital, thus impairing plaintiff's interest in the corporate stock; and that defendants had failed to pay $29,100 in taxes, fines, and other obligations. Jones seeks the specific performance of the agreement, including the *571 retransfer of the assets and control, an accounting, damages, and an injunction.
Defendants' answer claims, inter alia, that the $18,000 received by Jones in 1951 is a proper credit against any balance now owed; that Jones himself has breached the agreement in failing to transfer to the escrowee as many shares as have been paid for, barring him from any relief; that the 1952 agreement gave Jones a mere option to purchase shares, but that he has failed to tender the price; and that the contract is illegal as an unlawful restraint on the power of the board of directors. Lee and Adele filed a counterclaim against Jones, alleging that he had falsely represented to them that the company's profits would be more than sufficient to pay the indebtedness created by the contract of sale. In addition, the company counterclaimed against Jones for the $18,000 and for $494,000 which, it is said, Jones owes it for having issued shares to himself prior to 1952 without consideration on his part.
As stated, the Chancery Division found for the plaintiff. Its conclusions and the defendants' objections thereto will be considered in our discussion of the legal problems presented.
Defendants' main ground of appeal is that the trial court committed reversible error in finding that the contract of September 24, 1952 was valid and enforceable. It is said that in view of the fact that the opinion below found that many of its provisions are illogical and illegal the court could not proceed to order specific performance of the default provisions. Specifically, the contract fails to distinguish between a sale of assets and a sale of corporate stock; the provisions relating to Jones' control over major policy changes and those relating to arbitration illegally circumvent and ignore the power of the board of directors; and the provisions requiring the execution of the two mortgages were void as unlawfully impairing the company's credit. The question is whether the disregard or excision of the tainted provisions vitiates the entire contract.
*572 The Chancery Division answered in the negative, reasoning that:
"* * * The basic fact remains that defendant Lee Gabrielan undertook to purchase plaintiff's stock and to pay $165,000 therefor and, although he has made substantial payments thereon of principal and interest he ceased making such payment in November 1955, he has breached the contract and is in default."
We agree with this finding. The general rule is set forth in the Restatement, Contracts, § 603, p. 1119:
"A bargain that is illegal only because of a promise or a provision for a condition, disregard of which will not defeat the primary purpose of the bargain, can be enforced with the omission of the illegal portion by a party to the bargain who is not guilty of serious moral turpitude unless this result is prohibited by statute. Recovery is more readily allowed where there has been part performance of the legal portion of the bargain."
Disregard of the illegal provisions of the contract in question will surely not defeat its primary purpose. Cameron v. International Alliance of Theatrical Stage Employees and Moving Picture Operators of United States and Canada, Local Union No. 384, 119 N.J. Eq. 577, 590 (E. & A. 1935); Fishell v. Gray, 60 N.J.L. 5 (Sup. Ct. 1897). The unlawful provisions were incidental provisions, granting added privileges and protection to the parties. The primary purpose of the transaction was a sale of plaintiff's stock in the corporation. To declare the entire contract illegal and void would be unfair, as the parties have partially performed their bargain and are no longer in a position to revert to their former status. Moreover, the judgment does not require the defendants to render the unpaid balance to plaintiff; the individual defendants are simply ordered to make no further payments on the contract. Nor do the default provisions operate so as to result in a forfeiture of payments already made; Jones is, under the contract, given only the right to repurchase such shares as have been delivered to the escrowee.
*573 The same result also obtains from a consideration of that line of authority to the effect that in equity the rights of the parties will be settled inter se according to the dictates of equity and justice where creditors or third persons are not involved. See, e.g., Fountain v. Fountain, 9 N.J. 558, 568 (1952); Whitfield v. Kern, 122 N.J. Eq. 332, 346 (E. & A. 1937); 1 Fletcher, Cyclopedia, Corporations (rev. ed. 1931), § 46, p. 173 et seq.
Professor Corbin suggests that questions of "divisibility" have been decided in the final analysis on the basis of a "judicial instinct for justice" rather than by invoking general rules governing the separability of tainted provisions. 6 Corbin, Contracts (1951), § 1520, p. 1004. Our "instinct for justice" is particularly aroused here; for the defendants have obtained from plaintiff a going business without the payment of anything but their individual labor. For upwards of six years they have received salaries, drawn other moneys, and used its assets. Clearly they will not be heard to say that the plaintiff should be remediless in the face of this default. The injustice of any other result is accentuated when we consider that the Gabrielans' joint tax returns for 1952, 1953, and 1954 show a total income from this business of $6,412, $16,726.99, and $15,291.72, respectively. We perceive no real basis for any complaint as to this aspect of the ruling below.
It is argued that the court erred in finding that Adele breached the contract and was in default when, in fact, she had not even signed the 1952 contract. We have no doubt that Adele was a proper and necessary party, since she was an active participant in the management of the company and the co-maker of the promissory note. In addition, she was a shareholder and an officer of the company. The motion to dismiss her as a party defendant was properly denied. The inadvertent reference in the judgment below to Adele's having breached the contract is an error which could have been corrected by motion to the trial court under R.R. 4:62-1.
*574 Another specification of error has it that Jones is disentitled to equitable relief for his own failure to do equity. It is argued in this vein that, prior to defendants' default, Jones had breached the 1952 contract in failing to deliver to Lee's escrowee 86 shares for which payment had been made. Defendants are not deprived of this defense either because Jones' breach did not precipitate Lee's default or because defendants did not complain of that breach until this action was brought. 3 Williston, Contracts (rev. ed. 1936), § 839, p. 2352, citing Allen v. Aylesworth, 58 N.J. Eq. 349, 353 (Ch. 1899).
But this contention must be rejected for other reasons. First, the share certificates were to be turned over to the escrowee, not to Lee personally. The delay in the delivery did not in any way prejudice the defendants, for Lee already had been entrusted with the control of the company, subject to Jones' consent on major policy decisions. But even if the escrowee did have in his possession the additional 86 shares, Jones would still have had the right to withhold his consent on such matters. In short, the conduct of the parties and the agreement itself illustrate that the physical possession of the certificates was of no concern to either seller or buyer during the life of the contract. Compare Brown v. Ely, 92 N.J. Eq. 487, 489 (Ch. 1921). Theoretically, then, the provision respecting delivery of shares to an escrowee may be regarded as an undertaking independent from the sale of the stock.
Secondly, we construe the provision under which the seller would turn over one share to the escrowee "as and when payments made by the Buyer total the sum of $165.00" as relating not to the time of performance but to the character of performance. The time is nowhere stated to be of the essence; it is but a collateral stipulation. See 3 Williston, op. cit., supra, § 845, p. 2376, where it is said: "It is, however, desirable to distinguish between a breach of promise to do a thing and a breach of promise as to the time when it shall be done." If, then, it is the act, and not the time, of delivering that is the undertaking, plaintiff's readiness *575 to perform that act now is sufficient to remove any impediment to his maintaining this action.
Thirdly, the plaintiff ought to be excused for not having performed punctually. Since 730 of the 1,000 shares were represented by only one certificate, the parties could not have intended a delivery for each payment of $165. The practice followed was for plaintiff to transfer to the escrowee outstanding certificates as and when the payments made equaled the value of such certificates. Moreover, the last certificate for 730 shares could not be split up by plaintiff without defendants' cooperation since Jones did not have possession of the corporate books after 1952. For any of the foregoing reasons, we cannot agree that plaintiff has breached the contract or, if he has, that he is thereby precluded from suing on it. 4 Corbin, op. cit., supra, § 946, p. 811. Cf. Finn v. Glick, 42 N.J. Super. 514, 521 (App. Div. 1956); Comerata v. Chaumont, Inc., 52 N.J. Super. 299 (App. Div. 1958).
Our attention is directed to that part of the judgment below dismissing the defendants' counterclaim against Jones as unsupported by the evidence. As noted earlier, Lee and Adele sought to establish that Jones had falsely represented to them that the profits from the business would be sufficiently great as to enable them to meet the indebtedness created by the contract of 1951. The trial judge ruled that the execution of and entry into the 1952 contract rendered the claim of fraud as to the 1951 contract irrelevant and immaterial. With respect to Lee, it is clear enough that he intended, by entry into the 1952 contract, to relinquish any rights or claims arising out of the 1952 contract. See, e.g., Rosenberg v. D. Kaltman & Co., 28 N.J. Super. 459, 463, 464 (Ch. Div. 1953); Annotation, 106 A.L.R. 172, 173 (1937). Cf. Winans v. Asbury Park Nat'l Bank and Trust Co., 13 N.J. Super. 577, 581 (Ch. Div. 1951).
Adele, however, who was not a party to the 1952 contract, did not forego her right to assert claims arising out of the 1951 contract, unless it be by reason of her subsequent *576 conduct. In our view, it is abundantly clear that she too must be deprived of this claim. As an active participant in the business and as co-maker of the note, Adele consented to the weekly payments that were made to Jones from July 1951 until November 5, 1955. The failure to assert the alleged fraud until April 1957 constitutes a waiver. "Delay in rescission of the contract is evidence of a waiver of the fraud and an election to treat the contract as valid." Allen v. Logan, 116 N.J. Eq. 550, 552 (E. & A. 1934). See also Dennis v. Jones, 44 N.J. Eq. 513, 516 (E. & A. 1888); Franco v. De Voursney, 2 N.J. Super. 359, 360, 361 (Ch. Div. 1949). Cf. Taner v. Atlantic Cas. Ins. Co., 37 N.J. Super. 9, 12 (App. Div. 1955).
Even if the trial judge had permitted defendants to introduce evidence to establish this cause, the circumstances point to its spuriousness. When Jones brought suit in 1952 on the original contract, defendants alleged no fraud. And their then attorney at that time testified that the answer in that action included all the defenses he had discussed with his clients, Lee and Adele. Moreover, there had been a previous default; and the defendants' attorney at that time advised them not to enter into the 1952 contract with Jones because the terms were too burdensome. Under these circumstances, it is beyond belief that Jones' alleged overstatement of the company's prospects had been a factor in defendants' calculations. The ruling of the trial judge in excluding evidence of fraud as to the 1951 agreement was proper.
The trial court directed an accounting to determine what sums had been wrongfully withdrawn from the corporation since September 1952 in excess of those permitted by the 1952 contract. Defendants apparently are apprehensive that the moneys which have been used to make payments to Jones might be includible in the category of wrongful withdrawals and that, as a result, they will be held personally accountable to the company for such payments. Accordingly, at the trial below they made an effort to show that the *577 $50,000 paid to Jones was out of funds which the 1952 contract expressly designated for that purpose.
The 1952 contract provides that the promissory note executed by the Gabrielans is payable by stated amounts each week, "which amounts may be advanced out of corporate profits and/or earnings, if existent." The trial judge determined that this provision
"does not have the meaning ascribed to it by defendants Gabrielan who contend that `earnings' mean any return on labor. The Court holds that the phrase as here used at most means net earnings or net profits and was a crude method employed by the parties to the contract in dealing with such earnings as if they were dividends formally declared."
Defendants now argue that the court erred in excluding evidence that would have proved that the parties intended a more expansive definition of the word "earnings." Arguing that the term is on its face ambiguous, defendants cite Corn Exchange Nat'l Bank and Trust Co. of Philadelphia v. Taubel, 113 N.J.L. 605 (E. & A. 1934), as authority for relaxing the parol evidence rule in the present circumstances. It is also argued that Jones knew that the Gabrielans had no personal funds with which to pay the installments and therefore must have intended that the weekly "earnings" of the company be the exclusive source of the purchase money payments. Fortifying their view that the "net earnings" construction of the trial judge was improper, defendants allude to the circumstance that net earnings or profits are computed annually, whereas the contract calls for weekly payments. The argument concludes with the point that, if this phrase was a "crude method" of allocating dividends, then defendants have paid nothing toward the purchase price, for most of the dividends would belong to Jones in any event as the majority shareholder.
We are of a different persuasion. The contract unequivocally states that the payments to Jones were to come from the company's "profits and/or earnings, if existent." The latter phrase clearly indicates that it was within the *578 contemplation of the parties that there might be occasions when the company would not have earnings, in which event the weekly payments were to come from the Gabrielans personally. That Jones was aware that they had no funds is of no significance; for if they were unable to pay, he would have resort to the default provisions. Obviously, defendants' attorney in 1952 realized that this was probable, for he advised defendants not to enter into the 1952 contract. To relieve defendants from the operation of the terms they agreed upon, well knowing the difficulties ahead, in the guise of construing "earnings" as "any return on labor or operations" would be to write the term "if existent" out of the contract. Nor is it reasonable to assume that Jones, who insisted on various protections for the company's financial status  undoubtedly in anticipation of a possible reversion to him on defendants' default  would have given defendants the unlimited power to impair the company's capital (and consequently the value of the shares he retained), which power would be inherent in the defendants' interpretation of the "profits and/or earnings" clause.
We have considered the other specifications of error raised in the brief, but none has sufficient substance to warrant further regard.
The judgment of the Chancery Division is in all respects affirmed.