607 A.2d 142

CYNTHIA M. JACOB AND RICHARD F. COLLIER, JR., EACH INDIVIDUALLY AND AS SHAREHOLDERS OF NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORATION, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORATION; RICHARD A. NORRIS; G. ROBERT MARCUS; PETER D. HUTCHEON; HERBERT S. FORD; PETER R. KNIPE; JOEL N. JACOBSON; BRUCE E. MANTELL; WILLIAM C. SLATTERY; WALTER G. REINHARD; VICTOR S. ELGORT; BRUCE P. MCMORAN; KEVIN T. O'BRIEN; M. KAREN THOMPSON; JOHN J. EAGAN; STEPHEN M. ASPERO AND JAMES H. LASKEY, INDIVIDUALLY AND AS SHAREHOLDERS AND OFFICERS OF NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORATION, AND AS PARTNERS OF SOMERSET LEASING ASSOCIATES, A NEW JERSEY PARTNERSHIP, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

BRUCE P. MCMORAN, INDIVIDUALLY AND AS A SHAREHOLDER OF NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORATION, DEFENDANT–CROSS–CLAIMANT AND THIRD–PARTY PLAINTIFF, v. NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORATION; RICHARD A. NORRIS; THOMAS P. MCLAUGHLIN; G. ROBERT MARCUS; PETER D. HUTCHEON; CYNTHIA M. JACOB; HERBERT S. FORD; PETER R. KNIPE; JOEL N. JACOBSON; BRUCE E.

MANTELL; WILLIAM C. SLATTERY; WALTER G. REIN-HARD; VICTOR S. ELGORT; RICHARD F. COLLIER, JR.; KEVIN T. O'BRIEN; M. KAREN THOMPSON; JOHN J. EA-GAN; STEPHEN M. ASPERO; JAMES H. LASKEY; KENNETH R. SCHAEFFER; DAVID R. STRICKLER AND JOHN L. MES-ROBIAN, INDIVIDUALLY AND AS SHAREHOLDERS AND OF-FICERS OF NORRIS, MCLAUGHLIN & MARCUS, THIRD-PAR-TY DEFENDANTS.

NORRIS, MCLAUGHLIN & MARCUS, A NEW JERSEY CORPORA-TION, FOURTH-PARTY PLAINTIFF, v. MCMORAN & PALMI-ERI, P.C., A NEW JERSEY CORPORATION; WILLIAM BEHAN AND FRANK PALMIERI, INDIVIDUALLY AND AS SHARE-HOLDERS AND OFFICERS OF MCMORAN & PALMIERI, P.C., FOURTH-PARTY DEFENDANTS.

Argued December 2, 1991—Decided May 28, 1992.

*Frederick L. Whitmer* argued the cause for appellant and cross-respondent Cynthia M. Jacob (*Pitney, Hardin, Kipp & Szuch,* attorneys).

*James F. Keegan* argued the cause for appellant and cross-respondent Richard F. Collier, Jr. (*Bendit, Weinstock & Sharbaugh,* attorneys).

*Laurence B. Orloff* argued the cause for respondents and cross-appellants (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys).

The opinion of the Court was delivered by

**GARIBALDI, J.**

*RPC* 5.6 of New Jersey's Model Rules of Professional Conduct prohibits lawyers from making employment agreements that restrict the practice of law. Plaintiffs, Cynthia M. Jacob and Richard F. Collier, Jr., attorneys at law, were shareholders and employees of the defendant law firm Norris, McLaughlin & Marcus (NMM), prior to their departure to establish their own law firm. NMM had a Service Termination Agreement that barred plaintiffs from collecting termination compensation if they continued to represent firm clients or solicit firm attorneys or other paraprofessionals within a year of their departure. They thus faced a strong financial disincentive against retaining prior clients or co-workers. The primary issue in this appeal is whether the provisions in the Agreement precluding compensation restrict the practice of law in violation of *RPC* 5.6 and are thus void as against public policy.

## I

In October 1987, Jacob, Collier, and an associate, Sweet, left NMM to establish their own law firm, Collier, Jacob & Sweet. Together, the three took with them a number of associates, a paralegal, and, according to NMM, clients who had generated approximately $500,000 in annual billings for the firm.

The terms of their departure were governed by two agreements entered into by the parties on February 11, 1986: a Buy–Sell Agreement and a Service Termination Agreement. The Buy–Sell Agreement requires NMM to purchase the shares of any shareholder whose employment with NMM is terminated for any reason at values determined in the agreement. That agreement was executed and is not in dispute.

The Service Termination Agreement (Agreement) provides departing members with compensation above their equity interest in the firm. Paragraph 1 states that "[i]n consideration of Member's services to the Law Firm, the Law Firm agrees to pay the applicable amount of termination compensation * * *

and to provide related benefits appropriate to the category of termination as set forth in this paragraph * * *." Those categories include competitive voluntary departure (in which the member solicits firm clients or employees to leave the firm with him or her), non-competitive voluntary departure, mandatory retirement, involuntary departure, disability, and death. When the partner leaves voluntarily and non-competitively, as a result of mandatory retirement, or involuntarily, the Agreement provides the following compensation:

(i) 25% × 110% of the Member's annual draw applicable immediately prior to departure; (ii) 100% of any amount owed to the Member by the Law Firm with respect to any calendar year prior to the year in which departure occurs; and (iii) 110% of the pro rated portion of any net positive balance after reconciling any amount owed to the Member by the Law Firm with any amount owed by the Member to the Law Firm with respect to the current calendar year, such pro ration to be based on the amount of the current calendar year completed as of departure as compared to the full year. In addition, the Member shall have the right to purchase from the Law Firm the life insurance (and any terminable cash reserve) maintained with respect to the Member's life by the Law Firm under any Buy/Sell Agreement then in force.

The Agreement, however, draws a sharp distinction between competitive and non-competitive departures. In a competitive departure, "the Law Firm shall have no obligation to pay and the Member shall have no right to receive any termination compensation." The only benefit provided is the right to purchase life insurance.

A departure is competitive

if within one (1) year of the date of termination of employment the Member either engages in the practice of law involving professional services to clients of the Law Firm, who are clients of the Law Firm at the date of termination, or solicits other professional and/or paraprofessional employees of the Law Firm to engage in the practice of law with the departed Member * * *.

The Agreement's competitive departure provision thus creates a financial disincentive against a departing shareholder's retaining the firm's clients or soliciting its employees.

After leaving NMM, Jacob and Collier together requested $81,125 as compensation under the Agreement. NMM refused the request, arguing that Jacob's and Collier's retention of clients (in violation of the "anti-solicitation" provision) and their

raiding of employees (in violation of the "anti-raiding" provision) rendered their departure competitive and thus precluded compensation under the terms of the Agreement.

In January 1989 plaintiffs filed suit against NMM, arguing that the competitive-departure provisions were void as against public policy because they violated *RPC* 5.6 of the Rules of Professional Conduct. The Chancery Division agreed with plaintiffs, finding that the provisions violated *RPC* 5.6 by requiring departing attorneys to choose between representing former NMM clients and losing their benefits under the Agreement, and by discouraging attorneys from hiring professionals who they believed would provide the "highest standards of service" to those clients. Moreover, the court found that the primary purpose of the Agreement was to fix compensation for departing members and that severing the "offensive language" from the Agreement would not defeat that purpose. The financial disincentive provisions thus could be severed from the Agreement, thereby entitling plaintiffs to the compensation otherwise provided by the Agreement.

The Appellate Division reversed the Chancery Division. Although conceding that the anti-solicitation provision might have an "incidental effect" on plaintiffs' decision to retain clients on termination, the court held that that effect was not tantamount to the type of restriction on the practice of law prohibited by *RPC* 5.6. 247 *N.J.Super.* 266, 272, 588 *A.*2d 1287 (1991). The court noted the difficulty a firm faces in compensating its departing members while suffering the contemporaneous loss of client revenue, and held that the Agreement provided "payment or nonpayment of termination compensation * * * in a way that strikes a reasonable balance between the probable needs of a departing member and the consequences to the firm of the member's departure, that is, whether with or without the firm's clients." *Ibid.* The court did not address the validity of the anti-raiding provision.

The court noted that even if the anti-solicitation provision were unenforceable, Jacob and Collier would still not be entitled to compensation. Finding that the purpose of the Agreement "was to provide financial assistance to a departing member only under circumstances not inconsistent with defendant's economic interest," *id.* at 273, 588 *A.*2d 1287, the court stated that the right to termination compensation was "inextricably coupled" with the competitive-departure provision. *Ibid.* If the court deemed that provision unenforceable, then the entire Agreement must fall. *Ibid.*

The Appellate Division also held that equitable considerations should bar plaintiffs' claim. Because both plaintiffs had voluntarily entered into the Agreement, the court believed they would be unjustly enriched by receiving the benefits of the Agreement while being spared its undesirable conditions. *Id.* at 273–74, 588 *A.*2d 1287.

Plaintiffs filed a petition for certification and defendant filed a cross-petition for certification. The Court, considering the matter to be interlocutory in nature, treated plaintiffs' petition as a motion for leave to appeal, which it granted, and dismissed as moot the petition and cross-petition for certification. 126 *N.J.* 340, 598 A.2d 896 (1991).

## II

### A

This Court adopted the Rules of Professional Conduct (RPC) pursuant to its constitutional authority to regulate the practice of law. *N.J. Const.* art. VI, § 2, ¶ 3. They establish the state's public policies with respect to attorney conduct. Contracts that violate the RPCs violate public policy, and courts must deem them unenforceable.

*RPC* 5.6 states in pertinent part that
A lawyer shall not participate in offering or making:

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement \* \* \*.

The RPC's plain meaning indicates that any provision, whether direct or indirect, that operates so as to restrict a lawyer's post-termination practice will contravene the ethical rule.

The history behind the RPC and its precursors reveals that the RPC's underlying purpose is to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice. The RPC is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal. *See* Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 486 (1985).

American Bar Association (ABA) ethical opinions in the 1960s set the stage for the modern rules prohibiting restrictive covenants among lawyers. In Opinion 300 (1961), Opinion 521 (1962), and Informal Opinion 1072 (1968), the ABA's Committee on Professional Ethics invalidated restrictive covenants in several legal-employment agreements. The Committee emphasized the distinction between the business principles governing commercial enterprises and the ethical principles governing the practice of law. The Committee stated that " 'clients are not merchandise[,] [l]awyers are not tradesmen' ", and that restrictive covenants inappropriately " 'barter in clients.' " *Op. 300* (1961) (citations omitted). The Committee also emphasized the personal relationship between lawyer and client, and noted the tendency of restrictive covenants to "interfere with and obstruct the freedom of the client in choosing and dealing with his lawyer." *Informal Op. 1072* (1961) (citations omitted).

In 1969, the New Jersey Bar Association's Advisory Committee on Professional Ethics referred to those ABA opinions in holding that a covenant in a partnership agreement that restricted withdrawing partners from practicing within the county for five years following departure was improper and unethi-

cal. Op. 147, 92 *N.J.L.J.* 177 (March 20, 1969). The Committee stated that the "client market" can be divided "only through individual performance and the establishment of a well-merited reputation for professional capacity and fidelity to trust." *Ibid.* (citation omitted). A restrictive covenant is an improper "attempt to control and divide the 'client market' by means other than individual performance." *Ibid.* The Committee also noted the ABA Model Code, soon to be adopted by New Jersey, discussed below. *Cf. New Jersey Supreme Court Advisory Committee on Professional Ethics Op. 203* (1971) (in holding that firm losing client to a departing attorney-stockholder must release client's files, Committee stated that "a client has a right to be represented at all times by counsel of his own choosing").

The ABA adopted the *Disciplinary Rules of the Model Code of Professional Conduct (DR)* in 1969. New Jersey adopted the Model Code in 1971. *DR* 2–108(A), regarding restrictive covenants, was written against the backdrop of the earlier ethical opinions focusing on the non-commercial nature of the legal profession and the importance of retaining both the lawyer's right to practice and the client's right to choose a lawyer. It stated:

> A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement except as may be provided in a bona· fide retirement plan * * *.

Most of the case law and disciplinary opinions in New Jersey and elsewhere that analyze restrictive covenants do so under *DR* 2–108(A). New Jersey did not adopt the ABA Rules of Professional Conduct, including *RPC* 5.6, until 1984. Pressler, *N.J. Court Rules,* comment on *R.* 1:14 (1992). However, because the wording of *DR* 2–108(A) and *RPC* 5.6 is so similar, the same reasoning is applicable to both.

### B

The case law is clear that *RPC* 5.6 and its precursor, *DR* 2–108(A), forbid outright prohibitions on the practice of law. A

New Jersey court was one of the first in the country to interpret the new disciplinary rule, *DR* 2–108(A). In *Dwyer v. Jung*, 133 *N.J.Super.* 343, 336 *A.2d* 498 (Ch.Div.), *aff'd*, 137 *N.J.Super.* 135, 348 *A.2d* 208 (App.Div.1975), the partnership agreement in question provided that the firm's clients would be divided among the partners on dissolution. In language echoing the ABA's earlier opinions, the court stated that "[a] lawyer's clients are neither chattels nor merchandise * * *." The court emphasized that while a "reasonable" restrictive covenant in a commercial setting would not be considered against public policy,

> [c]ommercial standards may not be used to evaluate the reasonableness of lawyer restrictive covenants. Strong public policy considerations preclude their applicability. In that sense lawyer restrictions are injurious to the public interest. A client is always entitled to be represented by counsel of his own choosing. See *Marshall v. Romano*, 10 *N.J.Misc.* 113, 114, 158 *A.* 751, 751 (C.P.1932). The attorney-client relationship is consensual, highly fiduciary on the part of counsel, and he may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. * * * No concept of the practice of law is more deeply rooted. [*Dwyer, supra*, 133 *N.J.Super.* at 346–47, 336 *A.2d* 498 (footnote omitted) (citation omitted).]

*Dwyer* makes clear that the practice of law must be carefully governed by ethical considerations rather than by the economic concerns that guide strictly commercial enterprises. The court also stated that *DR* 2–108(A) concerns not only an attorney's "right" to practice law, as indicated by its literal language, but also the client's right to choose an attorney.

By distinguishing an employment agreement among physicians from one among attorneys, this Court, in *Karlin v. Weinberg*, 77 *N.J.* 408, 419, 390 *A.2d* 1161 (1978), endorsed the principles enunciated in *Dwyer*. We noted that *DR* 2–108(A) prohibits "restrictive covenants of any scope" among lawyers and that such covenants are *per se* "detrimental to the public interest." *Id.* at 420, 390 *A.2d* 1161.

Other states have almost uniformly shared New Jersey's dim view of restrictive covenants in employment agreements among lawyers. Laurel S. Terry, *Ethical Pitfalls and Malpractice Consequences of Law Firm Breakups*, 61 *Temp.L.R.* 1055,

1072–74 (1988) (hereinafter Terry). For example, in refusing to enforce a covenant allowing withdrawing partners to take only particular clients and no others, one court stated that:

> we believe that each person must have the untrammelled right to the counsel of his choice. A contrary decision would allow clients to be unknowingly treated like objects of commerce, to be bargained for and traded by merchant-attorneys like beans and potatoes. [*Corti v. Fleischer*, 93 *Ill.App*.3d 517, 49 *Ill.Dec.* 74, 79, 417 *N.E.*2d 764, 769 (1981).]

*See also Graubard Mollen Horowitz Pomeranz & Shapiro v. Moskovitz*, 149 *Misc.*2d 481, 565 *N.Y.S.*2d 672, 675–76 (Sup.Ct. 1990) (court would not enforce restrictive covenant requiring non-retiring departing partners to refer new clients to old firm and avoid impairing the firm's relationship with its current clients "in order to serve the greater social purpose of providing clients with full and free choice of counsel"); *Cohen v. Graham*, 44 *Wash.App.* 712, 722 *P.*2d 1388, 1391 (1986) (court would not enforce partnership agreement provision prohibiting departing lawyers from representing firm's clients), *review denied*, 107 *Wash.*2d 1033 (1987); *cf. Meehan v. Shaughnessy*, 404 *Mass.* 419, 535 *N.E.*2d 1255, 1262 (1989) (court, in reinterpreting partnership agreement to bring it into compliance with Massachusetts' equivalent of *RPC* 5.6, stated that the "strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant").

Disciplinary opinions similarly find that restrictive covenants prohibiting legal representation violate the ethical rules. *See, e.g., Legal Ethics Comm. of the District of Columbia Bar Op. 181* (1987), *reprinted in Nat'l Rep. on Legal Ethics*, n. 10 (1988) (prohibition on departing partner's "interference" with the firm's clients violates DR 2–108(A)); *Professional Ethics Comm. of the Texas State Bar Association Op. 422* (1984), *reprinted in Nat'l Rep. on Legal Ethics* n. 1 (1985) (agreements restricting former employees from practicing law in competition with former firm, or from representing former clients of firm, are prohibited by DR 2–108(A), based on Model Code's premise that "clients should have the right of informed

choice of an attorney of competence and integrity to represent them"). *See generally* Terry, *supra*, 61 *Temp.L.R.* at 1072 n. 90, 1074–75; Robert W. Hillman, *Law Firm Breakups: The Law and Ethics of Grabbing and Leaving* 28 & n. 22 (1990).

## C

Financial-disincentive provisions differ from direct restrictive covenants. They do not impose a blanket or geographical ban on the practice of law nor do they directly prohibit an attorney from representing former clients. By selectively withholding compensation, however, such provisions strongly discourage "competitive" activities.

*Dwyer*, its progeny, and judicial and ethics opinions around the country disclose universal recognition of the impropriety of directly-restrictive covenants. We believe that indirect restrictions on the practice of law, such as the financial disincentives at issue in this case, likewise violate both the language and the spirit of *RPC* 5.6. Any provision penalizing an attorney for undertaking certain representation "restricts the right of a lawyer to practice law" within the meaning of the RPC.

By forcing lawyers to choose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel. Those provisions thus cause indirectly the same objectionable restraints on the free practice of law as more direct restrictive covenants. As one commentator has stated,

> [f]aced with a choice of taking a share of the firm's profits or some of its clients, a partner may well choose the former if it yields a net economic benefit. In that case the client's freedom of choice has been bargained away just as effectively as if the partnership agreement contained a bald restrictive covenant. [Hillman, *supra*, at 20 (Supp.1991).]

Because the client's freedom of choice is the paramount interest to be served by the RPC, a disincentive provision is as detrimental to the public interest as an outright prohibition. Moreover,

if we were to prohibit direct restraints on practice but permit indirect restraints, law firms would quickly move to undermine *RPC* 5.6 through indirect means.

The case law almost uniformly holds that financial disincentive provisions, like direct prohibitions, are unenforceable as against public policy. *See Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg,* 461 *N.W.*2d 598, 601–02 (Iowa 1990) (provision conditioned payment of departing partner's interest in firm on refraining from acts deemed detrimental to partnership); *Cohen v. Lord, Day & Lord,* 75 *N.Y.*2d 95, 551 *N.Y.S.*2d 157, 158, 550 *N.E.*2d 410, 411 (1989) (partnership agreement conditioning payment of partnership revenues on refraining from competition with former law firm "functionally and realistically discourage[d]" withdrawing lawyer from representing his client); *Hagen v. O'Connell,* 68 *Or.App.* 700, 683 *P.*2d 563, 564–65 (1984) (agreement forced attorney to forfeit 40% of the value of stock if he or she did not sign agreement not to compete); *Gray v. Martin,* 63 *Or.App.* 173, 663 *P.*2d 1285, 1290–91, *review denied,* 63 *Or.App.* 173, 668 *P.*2d 384 (1983) (agreement required departing attorney to forfeit share of firm's profits if he or she practiced in certain geographic area); *Spiegel v. Thomas, Mann & Smith,* 811 *S.W.*2d 528, 529–31 (Tenn.1991) (provision provided payment of deferred compensation conditioned on not practicing law). *See generally* Terry, *supra,* 61 *Temp.L.R.* at 1075–78 & nn. 109–10. *Contra Haight, Brown & Bonesteel v. Superior Court,* 234 *Cal. App.*3d 963, 285 *Cal.Rptr.* 845, 848 (Ct.App.1991) (provision requiring withdrawing partner to forfeit partnership interest if he or she practiced law competitively not *per se* violation of the ethical rules because the rule only applies to absolute prohibitions); *Denburg v. Parker Chapin Flattau & Klimpl,* Index No. 15840/90 (N.Y.Sup.Ct.1991), *reported in N.Y.L.J.,* April 2, 1991, p. 22, col. 4 (partnership agreement requiring withdrawing attorney who continued to practice law to pay firm certain amount did not restrict practice of law).

The ethics committees of many state bars have also held that financial disincentives violate the disciplinary rules. *See, e.g., Legal Ethics Comm. of the District of Columbia Bar Op. 122* (1983) (agreement allowing withdrawing partner to represent client but requiring fee-sharing is disincentive to representing clients and therefore violates *DR* 2–108(A)); *Kentucky Bar Association Ethics Committee E–326* (1987), *reprinted in Nat'l Rep. on Legal Ethics* n. 2 (1988) (in ruling on partnership agreement offering additional compensation to withdrawing partner who agrees not to practice in Kentucky for two years, committee held that "the offering of inducements or the conditioning of benefits on the basis of compliance with a non-compete covenant would be in conflict with the disciplinary rules"); Olavi Maru, *Digest of Bar Association Ethics Opinions*, No. 10761 at 125 (Supp.1980) (District of Columbia, *Op.* 122 (1979)) (agreement requiring lawyer representing firm's former clients to pay former firm 40% of net billings indirectly restricts practice of law by imposing "a barrier to the creation of a lawyer-client relationship between the departing lawyer and clients of his former firm"); *id.,* No. 10989 at 172 (Supp. 1980) (Illinois, *Op.* 628 (1978)) (agreement requiring lawyer representing firm's former clients to pay firm 50% of resulting income restricts practice of law and limits availability of legal counsel).

## D

█ NMM argues that the Court should distinguish between agreements that require departing lawyers to forfeit their equity interest in a firm and those that merely deprive them of additional compensation unrelated to their vested interest. Because Jacob and Collier have already executed the Buy–Sell Agreement, which determined their equity interest in the firm, NMM argues that the firm should be free to condition the additional compensation provided by the Agreement according to the needs of the firm.

At the outset, we are not convinced that the Agreement does *not* represent the plaintiffs' interest in the firm. The Agreement specifically states that it provides compensation in "consideration of Member's services to the Law Firm," thus implying that the firm believes the departing member has "earned" his or her right to the compensation.

But we need not resolve that question. Regardless of whether the compensation in question represents "earned" or "additional" compensation, to condition payment on refraining from practice violates the Rules of Professional Conduct. The operative question is not what income the departing partner has a "right" to receive, it is the effect of the terms of payment on the lawyer's decision to decline or accept those clients who wish to choose him or her as counsel. If the agreement creates a disincentive to accept representation, it violates the RPCs, regardless of the lawyer's "right" to the compensation. As the Chancery Division aptly found, "[m]oney is money and the effect of [the] denial of money" has a chilling effect on a lawyer's willingness to represent clients.

The case at bar is similar to *Gray v. Martin, supra,* 663 *P.*2d at 1290. In *Gray,* a law firm had provided three forms of compensation to departing partners: (1) their unpaid draw, (2) their capital account, and (3) a percentage of the firm's future profits. Although the departing partners retained their equity-interest rights (the first two categories of compensation) regardless of post-departure activities, the agreement required them to forfeit the third type of compensation if they practiced law in certain counties. The court held that the agreement restricted their right to practice law by forcing the lawyer who chose to practice in the forbidden counties to "lose[ ] the benefits that would otherwise be his." *See also Kentucky Bar Association Op. E–326* (1987), *reprinted in Nat'l Rep. on Legal Ethics* n. 2 (1988) (provision allowing withdrawing partner to retain equity interest but requiring attorney to forfeit additional compensation if he or she practiced within state violated *DR* 2–108(A)).

NMM relies on *Cohen v. Lord, Day & Lord, supra,* which implied that if the agreement in question had withheld the firm's future profits rather than the lawyer's earned income, the court might have found the financial disincentive enforceable. 551 *N.Y.S.2d* at 160, 550 *N.E.2d* at 413. The *Cohen* court's dictum distinguishing future profits from earned income is inconsistent with the rest of the opinion's emphasis on avoiding disincentives that might impair client choice. As one commentator has noted in analyzing the opinion, "[i]t is the power of the disincentive, rather than the timing of the income to which it relates, that should drive the analysis *if* client choice is to retain its status as a principle of legal ethics bordering on the absolute." Hillman, *supra, Law Firm Breakups* at 21 (Supp.1991). We agree that ensuring client choice is the driving force behind the ethical rule. Hence, we decline to find a distinction between the lawyer's earned income and the firm's future profits.

## E

NMM justifies a narrow interpretation of *RPC* 5.6 by stressing that the type of provision at issue presents a reasonable economic arrangement designed to give additional benefits to those whose departure will not be detrimental to the firm. When a partner takes clients, the firm's economic strength is directly impaired. A provision reducing compensation in such a case merely accommodates that detrimental impact. The Appellate Division agreed, holding that NMM's agreement struck a "reasonable balance between the probable needs of a departing member and the consequences to the firm of the member's departure." 247 *N.J.Super.* at 272, 588 *A.2d* 1287. *See also Haight, Brown & Bonesteel, supra,* 285 *Cal.Rptr.* at 848 (court enforced covenant that let departing attorneys continue to practice while allowing remaining partners to retain income necessary to replace that lost from departed clients); *Denburg, supra, N.Y.L.J.* (April 2, 1991) (forfeiture of income may prove to have been a "reasonably limited arrangement for recoup-

ment of partnership liabilities"). *See generally* Stephen E. Kalish, *Covenants Not to Compete and the Legal Profession,* 29 *St. Louis U. L.J.* 423 (1985) (strict interpretation of rule against restrictive covenants gives too little weight to firm's legitimate economic interests).

Although NMM's argument sounds reasonable, it both ignores the underlying meaning of the disciplinary rule and misrepresents the practical effects of the financial disincentive provisions. The Rules of Professional Conduct govern the practice of law based on ethical standards, not commercial desires. The commercial concerns of the firm and of the departing lawyer are secondary to the need to preserve client choice. The more lenient test used to determine the enforceability of a restrictive covenant in a commercial setting, *see Solari Indus. v. Malady,* 55 *N.J.* 571, 576, 264 *A.*2d 53 (1970), is not appropriate in the legal context. *See, e.g., Dwyer, supra,* 133 *N.J.Super.* at 346, 336 *A.*2d 498 ("Commercial standards may not be used to evaluate the reasonableness of lawyer restrictive covenants."); *see also Karlin, supra,* 77 *N.J.* at 420 & n. 4, 390 *A.*2d 1161 (*Solari* test upholding reasonable restrictive covenants "can have no applicability to restrictive covenants among attorneys"); Comment, *Barefoot Shoemakers: An Uncompromising Approach to Policing the Morals of the Marketplace When Law Firms Split Up,* 19 *Ariz.L.J.* 509, 534 (1987) (that restrictive covenants among lawyers are unenforceable "does not necessarily mean that the firm's interest is negligible or non-existent, but that the disadvantages to the client outweigh any legitimate interest the firm might have").

Moreover, although law firms are understandably concerned about their financial well-being in view of the increasing fluidity of law-firm membership, that fluidity also justifies a heightened vigilance against any form of restrictive covenant. As the Legal Ethics Committee of the District of Columbia Bar Association has noted,

[w]hile a law firm undoubtedly has a legitimate interest in maintaining its clients, we are hesitant to announce views that unduly restrict the ability of

lawyers to change relationships in order to advance their careers, or that prevent or unduly hinder clients from obtaining legal representation from attorneys of their own choosing who may have formed new associations. [*Legal Ethics Comm. of the District of Columbia Bar Op.* 181 (1987), *reprinted in Nat'l Rep. on Legal Ethics* n. 10 (1988).]

Finally, the financial disincentive in the Agreement cannot be deemed a simple "accommodation" to the loss of clients because it bears no direct relationship to the financial damage that the firm may or may not incur. For example, if the departing partner merely completed one matter for one former client, the entire compensation package would be forfeited despite the limited financial impact on the firm. In fact, the provision operates as a penalty designed to protect the former law firm's turf.

### III

All this said, we are not unmindful of the potential detrimental effect of the departure of a partner or partners on those remaining. As one commentator notes, "[l]aw firms are under siege. * * * For each firm that gains a partner and a new basket of clients, another firm loses an important source of revenues and gains an incentive to do its own lateral hiring." Hillman, *supra,* at 3. However, there are realistic ways to accommodate that concern without creating arbitrary, punitive measures that discourage a lawyer from representing those clients who desire his or her services.

In computing a withdrawing partner's equity interest in the former firm, accounting for the effect of the partner's departure on the firm's value is not unreasonable. Although the departing attorneys always have a right to receive the value of their capital accounts, in computing the value of any additional interest they have in the firm, the value they contributed can be offset by the decrease in the firm's value their departure causes.

In *Stern v. Stern*, 66 *N.J.* 340, 345, 331 *A.*2d 257 (1975), in valuing an interest in a law firm for equitable distribution purposes, the Court observed that

[g]enerally speaking the monetary worth of this type of professional partnership will consist of the total value of the partners' capital accounts, accounts receivable, the value of work in progress, any appreciation in the true worth of tangible personalty over and above book value, *together with good will,* should there in fact be any; the total so arrived at to be diminished by the amount of accounts payable as well as any other liabilities not reflected on the partnership books. [*Id.* at 346–47, 331 *A.*2d 257 (emphasis supplied) (footnotes omitted).]

In *Dugan v. Dugan*, 92 *N.J.* 423, 457 *A.*2d 1 (1983), another equitable distribution case, we further elaborated on the importance of "goodwill" as an element of the value of a partner's interest in a law firm. In defining goodwill, we noted Lord Eldon's observation in *Cruttwell v. Lye*, 34 *Eng.Rep.* 129, 134 (1810), that " 'good-will * * * is nothing more than the probability that the old customers will resort to the old place.' " *Id.* at 429, 457 *A.*2d 1. We noted that "[f]or purposes of valuing the goodwill of a law practice, the true enhancement to be evaluated is the likelihood of repeat patronage and a certain degree of immunity from competition." *Id.* at 435, 457 *A.*2d 1. The probability of future patronage can be translated into prospective earnings. *Id.* at 431, 457 *A.*2d 1.

■ Accordingly, we recognize that if a partner's departure will result in a decrease in the probability of a client's return and a consequent decrease in prospective earnings, that departure may decrease the value of the firm's goodwill. It would not be inappropriate therefore for law partners to take that specific effect into account in determining the shares due a departing partner.

In *Dugan*, we recognized that goodwill is a definable property interest, but noted that its calculation is a complicated matter: 92 *N.J.* at 435, 457 *A.*2d 1. Nonetheless, the interest in avoiding the bookkeeping hassles of such computations is not sufficiently important to justify the arbitrary disincentives created by the formulaic approach taken by NMM.

An Oregon court has made a similar determination. In *Hagen v. O'Connell, supra,* the court refused to enforce a provision requiring a 40% devaluation of stock if the departing partner did not sign a non-compete agreement. 683 *P.*2d at 565. However, the court stated that "a professional corporation must have the right to adjust the value of its stock according to the effect created when a withdrawing shareholder takes clients from the firm." *Ibid.* The court did enforce those sections of the agreement that established a formula to calculate the value of the stock in a manner bearing "a reasonable relationship to the probable loss to the firm." *Ibid.*

We realize that our suggestion means that a partner's decision to take clients will not be entirely without an effect. However, loss of the firm's client revenue will be just one of many factors to be included in determining the value of the departing member's share in the corporation or interest in the partnership. Calculation of the actual financial impact of a partner's move, if made realistically and accurately, will not operate to *penalize* the lawyer's choice, and so will not constitute a restriction on the practice of law prohibited by *RPC* 5.6.

## IV

NMM argues that even if the provision discouraging withdrawing partners from representing former clients violates *RPC* 5.6 and is hence unenforceable, the provision discouraging partners from contacting the firm's professional and paraprofessional staff does not violate the RPC. The legality of the anti-raiding provision is an issue of first impression in New Jersey.

*RPC* 5.6 proscribes all agreements that "restrict[ ] the rights of a lawyer to practice * * *." The Agreement requires a departing partner to forfeit all termination compensation if he or she "solicits other professional and/or paraprofessional employees of the Law Firm to engage in the practice of law with the departed Member * * *." The "practice of law" consists

not only of lawyers' interactions with their clients, but also includes their interactions with colleagues. Agreements discouraging departing lawyers from contacting those lawyers with whom they would like to associate violate *RPC* 5.6.

The provision unduly constricts the right to practice of those attorneys who would have liked to have accompanied a departing partner, but who were not informed of that partner's interest due to an agreement creating a disincentive against their being contacted. The effect is all the more objectionable when the ignored attorney is an associate who was not a party to the agreement establishing the restriction.

Restrictive agreements have a similarly unfair effect on paraprofessionals. Paraprofessionals, no less than lawyers, should not have their career mobility inhibited, especially when the inhibition derives from an agreement to which they were not a party. The ABA has noted the intrinsic importance of such mobility. In an opinion addressing conflict-of-interest issues in paraprofessional hiring, the ABA stated that

[i]t is important that non-lawyer employees have as much mobility in employment opportunity as possible consistent with the protection of clients' interests. * * * [A]ny restrictions on the nonlawyer's employment should be held to the minimum necessary to protect confidentiality of client information. [*Informal Op. 88-1526* (1988).]

The practice of law also involves seeking the best services for one's clients. In some cases, lawyers may believe that the interests of their clients will be hindered by agreements that prohibit the free flow of attorneys and paraprofessionals. An associate familiar with the complex facts of a major case for a client who chooses to follow a departing partner may be an irreplaceable asset to that case. If agreements discourage lawyers from soliciting such associates' continued assistance, attorneys may feel that their ability to represent their clients is being compromised. The same may be true of paraprofessionals, although we recognize that a paraprofessional's work typically does not rise to the same level of importance. Accordingly, we conclude that the unrestricted "practice of law" includes

the right to solicit both attorneys and those members of the paraprofessional staff that attorneys believe are necessary to provide the best legal service for their clients.

There is little caselaw on the subject. However, the few opinions addressing similar "anti-raiding" provisions are in accord. In responding to an inquiry regarding the propriety of an agreement not to hire a former firm's associates, the American Bar Association Committee on Ethics stated that

[a]lthough the agreement in question does not restrict the right of the individual lawyer to practice directly, by restricting the right of association between attorneys it restricts such right indirectly and so falls within the prohibition of DR 2-108(A). [*ABA Informal Op.* 1417 (1978).]

In considering an agreement prohibiting a departing attorney from "interfering with or raiding its employees," the Legal Ethics Committee of the District of Columbia Bar relied on *ABA Informal Op. 1417* to hold that the provision in question was unacceptable. *District of Columbia Bar Association Op. 181* (1987), *reprinted in Nat'l Rep. on Legal Ethics* n. 10 (1988). Although the prohibition against employee *hiring* in these agreements was more far-reaching than the prohibition against employee *solicitation* contained in the NMM agreement, we believe that discouraging solicitation still constitutes an improper interference with the practice of law.

We also note the potential for unfairness inherent in the Agreement. Were the departing partner to contact even one paraprofessional, he or she would forfeit the entire compensation package otherwise provided.

## V

We find the financial disincentive provisions to be unenforceable. We therefore must determine whether the unenforceability of those provisions renders the remainder of the contract unenforceable. In other words, should we sever the offending portion and enforce the remainder, thereby allowing Jacob and Collier to receive the compensation benefits otherwise provided under the Agreement?

If striking the illegal portion defeats the primary purpose of the contract, we must deem the entire contract unenforceable. However, if the illegal portion does not defeat the central purpose of the contract, we can sever it and enforce the rest of the contract. *Jones v. Gabrielan*, 52 *N.J.Super.* 563, 572, 146 *A.*2d 495 (App.Div.1958); *see also Energex Lighting v. North Am. Philips Lighting*, 765 *F.Supp.* 93, 107–08 (S.D.N.Y.1991) (applying New Jersey law); *Cameron v. International Alliance*, 119 *N.J. Eq.* 577, 590, 183 *A.* 157 (E. & A. 1935), *cert. denied*, 298 *U.S.* 659, 56 *S.Ct.* 681, 80 *L.Ed.* 1385 (1936); *Township of Lodi v. Little Ferry Nat'l Bank*, 121 *N.J.Eq.* 213, 215, 189 *A.* 58 (Ch.1937). As *Williston* has stated, "the courts enforce the severable legal parts of an illegal divisible agreement where the unlawfulness does not permeate the whole and even in the case of indivisible contracts they strive to segregate and uphold if possible such portions as may be legal." 14 *Williston on Contracts* 1630, at 13 (Jaeger, 3d ed.1972) (footnote omitted).

The preamble to the Agreement states that "the Law Firm and Member desire to provide * * * for the compensation to be paid to Member following any termination of his employment as an officer of the Law Firm." The specific terms of the Agreement in fact provide compensation to every category of departing members, whether leaving voluntarily, involuntarily, due to a disability, or retiring, *except* those falling within the competitive-departure provision that we here deem unenforceable. The Chancery Division correctly concluded that the primary purpose of the Agreement was to provide compensation to departing members and that the competitive-departure provision could be excised. We therefore find the remainder of the contract enforceable, thereby entitling Jacob and Collier to the same compensation provided for non-competitive departures.

Our conclusion is in accord with the general approach courts take when they invalidate restraints on trade contained in otherwise valid contracts. As *Williston* states with regard to

covenants imposing unenforceable restraints: "Although a contract may contain excessively restrictive promises which are unenforceable, the contract may not be invalidated in its entirety where its general purpose is lawful." *Williston, supra,* § 1647B, at 285 (footnote omitted); 6A *Corbin on Contracts* § 1524, at 768–69 (1962).

Other jurisdictions that have addressed the severability of illegal restrictive covenants have held that the offending provision is severable from the employment agreement and that the remainder of the agreement is enforceable. Although the centrality of the illegal provision to the agreement as a whole varies with each case, we believe the general principle is clear. *See Hagen, supra,* 683 *P.*2d at 565 (provision in a Buy–Sell Agreement improperly requiring partners to sign a non-competition agreement or forfeit 40% of the value of their stock could be severed from the agreement as a whole); *Spiegel, supra,* 811 *S.W.*2d at 531 (although provision in agreement conditioning receipt of deferred compensation on refraining from practice of law was unenforceable, "remainder of the agreement remains enforceable"); *Cohen v. Graham, supra,* 722 *P.*2d at 1391 (in purchase-and-sale agreement governing dissolution of partnership, provision restricting partners from contacting and representing certain clients was not central to the agreement and could be severed, allowing the court to enforce the remainder of the agreement).

Policy considerations also support our conclusion. Unless we enforce the remainder of the Agreement and thereby require the firm to pay the compensation improperly withheld by the unenforceable provision, firms will have no incentive to stop making restrictive covenants. Moreover, if the affected attorneys know they will not recover anything under such agreements, they will have no incentive to challenge illegal covenants. Only by enforcing the remainder of the Agreement can we protect clients against restrictive covenants that would otherwise be illegal in principle but unassailable in practice.

## VI

NMM argues that equitable principles should bar Jacob and Collier from receiving the Agreement's benefits. That both the plaintiffs and defendants violated *RPC* 5.6 by signing the Agreement is true. Plaintiffs will get a "windfall" by receiving compensation despite their violation. But if we barred plaintiffs from receiving compensation, NMM would receive a "windfall" by receiving the benefits of a covenant that is against public policy and unenforceable. Because our decision will inevitably give a somewhat-undeserved windfall to one or the other party, we must determine which party should receive that windfall based on policy considerations.

In *Cameron, supra,* the court stated that it is "well settled that, if refusal to enforce or rescind an illegal bargain would work injury to parties for whose protection the law makes the bargain illegal, enforcement or recission, as the case may be, is awarded." 119 *N.J.Eq.* at 590, 183 *A.* 157. The law is designed to preserve client choice. The issue is thus not simply which party is more or less innocent, but which outcome best serves the public interest. With respect to a restraint on trade in connection with the sale of a business, Corbin has stated that

> [t]he reason that the buyer should be able to enforce the lawful promises of the seller is not that he is more nearly innocent than the seller but that[, *inter alia,*] * * * the harm to the public is mostly prevented by eliminating the illegal excess restraint, and the forfeiture resulting from total nonenforcement would be unjust punishment. [*Corbin, supra,* § 1524, at 769.]

In the present case, for the same reasons that justify severing the illegal provision, the public interest is served by invalidating the restrictive covenant. If we neither allow plaintiffs to challenge the covenant nor provide them with the benefits of the agreement that would belong to them in the absence of the illegal provision, no one will have the standing or motivation to challenge the illegal provisions. Law firms will then be able to include restrictive covenants in employment agreements without fear of enforcement, rendering *RPC* 5.6 impotent.

We note that equitable principles might bar a plaintiff's recovery if the plaintiff had been a senior partner instrumental in drafting a restrictive agreement, imposing it on his or her fellow partners or employees, and then sought to have the provision declared unenforceable when he or she decided to leave. Nothing in the record indicates that Jacob or Collier played such a role in developing the Agreement. Therefore, Jacob and Collier are entitled to the compensation provided by the Service Termination Agreement.

## VII

We conclude that the Agreement's competitive departure provision restricts the practice of law in contravention of *RPC* 5.6 and is therefore unenforceable as against public policy. Plaintiffs are entitled to the same compensation as those attorneys whose departure is non-competitive. Accordingly, we reverse the judgment of the Appellate Division and reinstate the Chancery Division's partial summary judgment in plaintiffs' favor.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—None.